GEORGE N. FLETCHER AND ROBERT P. TOMS v. THE THUNDER BAY RIVER BOOM COMPANY.

*Riparian rights—Agreements fraudulent against grantee.*

Riparian rights, unless expressly limited, extend to the middle of the navigable channel, and cover any shallows or middle ground not shown in the government surveys, but lying between such channel and the shore; and it makes no difference that the deed conveying the premises to which the rights attach describes them according to a city plat instead of the government survey.

Private agreements between joint riparian owners, whereby they apportion among themselves the submarine rights in front of their premises, cannot diminish the riparian rights of their grantees, if the latter have no notice of these agreements.

Agreements between joint riparian owners, after making conveyance, cannot affect the grantee's rights; and deeds made in pursuance of such agreements would be in fraud of those rights if not made to the grantee, or to those claiming under him.

Error to Alpena.   (Hart, J.)   June 13.—October 3.

EJECTMENT.   Plaintiffs bring error.   Affirmed.

*R. J. Kelley* and *J. B. Clayberg* for appellants.

*Norris & Uhl* for appellee.

SHERWOOD, J.   Ejectment to recover "a certain piece or

parcel of land lying and being in Thunder Bay river, in front of lots 14 to 23, inclusive, in block 8, in the city of Alpena, covered by waters of said Thunder Bay river, being known as that part of the middle ground in Thunder Bay river in front of said lots." Plea, general issue.

The cause was tried at the Alpena circuit before a jury, and the circuit judge directed a verdict for the defendant, which was duly rendered and judgment entered thereon. The case now comes before us on bill of exceptions. At the close of the trial three requests to charge were made by counsel for plaintiff and refused by the court, and exceptions taken. The errors complained of are the refusal of the court to severally give these requests in his charge, and the direction of the court to the jury to return their verdict for the defendant. The view we take of the case renders it unnecessary for us to discuss the matter contained in the requests further than will appear in what we have to say upon the direction given by the court to the jury.

It appears from the record before us, in this case, that Thunder Bay river runs through the city of Alpena, and on the east side of the river lies, according to the original United States survey, government lot 3, and on the west side, and directly opposite, government lots 4 and 5 according to the same survey, which includes the premises in controversy. It is claimed by the plaintiffs that in the river, and between these two parcels of land, there is "middle ground" or an island; that the same lies in front of all the city lots on the west side, from lot 14 to lot 34, both inclusive ; that there are two channels in the river at this point, one on each side of the island, and that the city lots on the west side only extend to the center of the westerly channel ; and that this action is brought to recover that portion of said "middle ground" or island, lying in front of city lot 14 and to and including city lot 23, according to the plat of said city,—it being the lower or southerly part of the claimed "middle ground" or island.

It very clearly appears that the easterly channel is the main channel of the river, and that that on the westerly side

was never used for navigation but principally for floatage and giving access to a mill a little up the stream, and later by the defendants for shore purposes and as booming water in common with others who have had occasion to pass and repass with floatables.  It is not disputed but that the defendant is the owner of all said city lots from 14 to 23 inclusive, and defendant claims to be the owner of all the frontage on the east side thereof, extending to the center of the easterly or main channel, and that the plaintiffs' proofs establish this fact.  The plaintiffs' testimony shows that what they claim to be the "middle ground" in said river commences several hundred feet north of lot 35, where the water is five feet deep, and extends south down the river to a point near lot 14, where the water is the same depth, and that that part of the claimed middle ground between 14 and 23 inclusive is nearly or quite under water all the time from two to five feet deep ;· that government lots 3, 4 and 5, which includes all of the said middle ground, were entered by the defendant's grantors on the fifteenth day of March, 1851, and continued to be used by them (the plaintiff Fletcher being one) until April 8, 1865.

The owners of government lots 3, 4 and 5 platted the same June 28, 1857, and the owners of government lots 4 and 5, so far as the evidence shows, have always claimed, in connection therewith, the ownership of said "middle ground ;" have built, or permitted to be built, mills and docks thereon, and have used the waters in the westerly channel for floatage and booming purposes, and portions of the time exclusively so.  Two government surveys of the sections and of the river through the same within which the premises are claimed to be located were offered in evidence,—one dated February 12, 1841, and the other June 19, 1858,— neither of which shows any middle ground or island at the place claimed ; and the same is true of the township survey and city plat, and so far as relates to that channel between city lots 14 and 23, the testimony of the plaintiff shows substantially the same thing.  Mr. Fletcher in his testimony says, upon his direct examination, when asked where

the two channels joined below the "middle ground" with reference to lot 14 : "The two channels of perhaps six feet of water must have been very nearly opposite lot 14; they probably got into deep water somewhere in front of lot 14,— at least eight feet anyway;" and when recalled upon his cross-examination, further testified : "This particular parcel of land that I am seeking to recover is land that is all under water to-day; it has not always been so." *Question.* "Has any portion of the 'middle ground' fronting these ten lots ever been out of water?" *Answer.* "Yes, sir; according to my best knowledge the first or second lots up there— meaning 22 or 23—had been dry land at times, depending upon the rise and fall of the river's fluctuating ; how long I could not say or how much ; some portions of it dependent upon the rise and fall of the lake."

We think, in view of all that is disclosed in the record in this case, if the decision had to depend upon the fact whether or not there was "middle ground" in front of the 10 lots referred to, the surveys and plattings, and the plaintiff Fletcher's testimony, might well be considered by the court as settling the question in the negative. But it appears conclusively, we think, that the title to the premises claimed, whatever may be their character, is shown by the record to be in the defendant. Plaintiff Fletcher, James K. Lockwood and John Oldfield owned government lots 3, 4 and 5 on the fourteenth day of June, 1859, Fletcher owning an undivided half and each of the others an undivided quarter, and on the twenty-eighth day of the same month platted the village of Alpena on said government lots 3, 4 and 5, said village lots in said plat all being numbered and extending to the bank of the river.

On May 25, 1862, Lockwood sold to Mason his interest in the property, and it is conceded by counsel for both parties that on the twenty-fifth day of September, 1862, plaintiff Fletcher owned an undivided half of the premises in question, and Oldfield and Mason each an undivided quarter. On the eighth day of April, 1865, Henry D. Bassett obtained by warranty deed without exception or reservation

village lots from 10 to 23 inclusive, and both parties admit title in him at that time to said lots. It is through this deed the defendant makes its title.

What is to be the construction of this deed? Does it not carry with it the premises in question? If the same property had been conveyed to Bassett by the government description, instead of by description according to the village plat, there could be no question upon the subject at the common law or under the decisions of this Court. Angell on Water-courses §§ 10 and 54, and cases there cited; *Norris v. Hill* 1 Mich. 202; *Gas-light Co. v. Industrial Works* 28 Mich. 182; *Atty. Gen. v. Sup'rs of Bay County* 34 Mich. 46; *Maxwell v. Bay City Bridge Co.* 41 Mich. 453; *Twogood v. Hoyt* 42 Mich. 609; *Pere Marquette Boom Co. v. Adams* 44 Mich. 403; *Richardson v. Prentiss* 48 Mich. 88; *Cole v. Wells* 49 Mich. 450.

The decisions upon this point are so full and exhaustive and so recent in this Court that we do not consider a review of them or further discussion of the point here profitable; such description clearly establishes the defendant's claim to the premises to the center of the main channel of the river.

In the case of *Watson v. Peters* 26 Mich. 508, it was fully decided by this Court that, when a lot is conveyed as designated in a city plat bounded on a navigable stream, with the water as a boundary, such conveyance carries with it the land under the water to the center of the stream. Mr. Justice Cooley in that case says: "The owner of city lots bounded on navigable streams, like the owner of any other lands thus bounded, may limit his conveyance thereof within specific limits, if he shall so choose, but when he conveys with the water as a boundary, it will never be presumed that he reserves to himself proprietary rights in front of the land conveyed, which he may grant to others for private occupation, or so occupy himself as to cut off his grantee from the privileges and conveniences which appertain to the shore of navigable water. Such privileges and conveniences constitute a part, and in many cases the principal part, of the

value of the grant; and it is precisely in these cases of city lots that they are of most value, and generally constitute the chief inducement to the purchase; and the chief, or at least a very important element, in determining the price. These cases, therefore, of all others, are those in which the reason of the rule which infers an intent to convey the land under the water, is most apparent and forcible. And the rule itself is too valuable, and too important, to be varied by so immaterial a circumstance as that the boundary on the water is defined by a line, instead of by making use of words which to the common understanding would convey the same meaning. And what we have said of navigable waters, is equally applicable to all natural water-courses." *Yates v. Milwaukee* 10 Wall. 497; *Trustees of Illinois & Michigan Canal v. Haven* 11 Ill. 554.

The record shows that after Bassett purchased he went immediately into possession of these ten lots, the most important, valuable and useful part of which seems to have been the water right upon their river frontage. While thus the owner and in possession, he gave two mortgages upon the property he purchased to John K. Hathaway,—the first dated April 13, 1865, for six thousand three hundred and fifty dollars, and describing the property as "all those lots, messuages and parcels of land usually known and described as lots Number 14, 15, 16, 17, 18, 19, 20, 21, 22 and 23, in block 8, in the village of Alpena, Alpena county, Michigan, as per the survey and plat of said village now on record in said county, together with the steam saw-mill, engine, boiler, shafting, saws, pulleys, belting and all machinery, and all else now in or hereafter put in, the new mill and engine-house and other buildings now on and to be put on the aforesaid ten lots or part of them, or built extending into the river from said ten lots of land, and with all property anywise used with any of the aforesaid, with the hereditaments and appurtenances thereunto belonging or in anywise appertaining." This description is herein given as tending to show, as we think, what Bassett understood was included

in his deed.   The second of said mortgages was dated November 16, 1865, and given for three thousand dollars.

These two mortgages were foreclosed, and the property sold under the above description, and bid off for the sum of ten thousand dollars, June 22, 1878, by James S. Hathaway, who sold the same by warranty deed to the defendant, March 22, 1880.

There is no question made, as we understand the record, but that defendant has all the rights and interest, under the master's deed, in the property in question which Bassett obtained under his deed; and if the latter owned to the center of the main channel of the river, then the defendant's title is complete to the premises claimed by the plaintiffs, and which, as we have shown, certainly must be the case, unless there is something in the record which necessarily changes the construction which the law, by a long course of decisions, both in England and in this country, has given to the effect of deeds conveying lands bordering on rivers, like the Bassett conveyance.

It is claimed by the plaintiff that the middle ground is an island, a separate and distinct parcel of land, and as such would not pass under the Bassett deed, as appurtenant to the shore lots.

Suppose the condition of the claimed "middle ground" to be as stated by counsel for plaintiff; still, under the evidence, the point would be untenable.   The island, as claimed, is nearer to the west shore than the east.   The government never recognized or meandered any such ground out in its survey, and under such circumstances it would be appurtenant to the west shore, and pass to the grantee of the ten lots bordering on that shore.   2 Bl. Comm. 261 ; 3 Kent's Comm. 412, 428 ; 1 Swift's Digest 111 ; Schultes on Aquatic Rights 117–138 ; *Ingraham v. Wilkinson* 4 Pick. 268 ; *Giraud v. Hughes* 1 Gill & J. 249 ; *People ex rel. Tibbits v. Canal Appraisers* 13 Wend. 355 ; *Lunt v. Holland* 14 Mass. 152 ; 1 Cooley's Bl. 501, note 3 ; *Canal Com'rs v. Tibbits* 5 Wend. 423 ; *Browne v. Kennedy* 5 Har. & J. 195 ; *Adams v. Pease* 2 Conn. 481 ; *Palmer v. Mulligan* 3 Caines 307 ;

*Jackson v. Louw* 12 Johns. 252; *People v. Platt* 17 Johns. 201; *Hooker v. Cummings* 20 Johns. 91; *Carter v. Murcot* 4 Burr. 2162; *Rex v. Wharton* 12 Mod. 510; Angell on Water-courses (7th ed.) §§ 44–52; *Handly's Lessee v. Anthony* 5 Wheat. 375.

The riparian rights of the defendant in this case, under his deed, extended to the thread of the stream, to the center of the main channel of the river, and entitled it to every beneficial use thereof, subject to the public easement in the same. *Clark v. Campau* 19 Mich. 325; *Lorman v. Benson* 8 Mich. 18; *Rice v. Ruddiman* 10 Mich. 126; *Ryan v. Brown* 18 Mich. 196.

The agreement of June 8, 1868,* between Fletcher, Lockwood and Oldfield, and the indorsed agreement thereon, were both immaterial, as was also the agreement of January 22, 1868,† between Mason, Minor and Lockwood. They

---

*It is hereby stipulated and agreed by and between George N. Fletcher, John Oldfield and I, James K. Lockwood, as follows, to-wit: To divide up the middle ground, or shore, in the Thunder Bay river, in section 22, township 31 north, of ra_ge 8 east, as follows: Commencing at the upper end, at a point where five feet of water is reached, going up stream, ending at a point where five feet of water is reached, going down stream, dividing the space between the same points into four equal parts,—that is to say, of the same length up and down the river,—and conveying the same by partition deeds at the earliest possible date, to-wit, two parts to George N. Fletcher and others, one part to John Oldfield, and one part to J. K. Lockwood. And whereas, the said Lockwood, being desirous to build or erect a steam saw-mill upon said middle ground, shall have the first choice of a site confined within the limits aforesaid, and may also use, occupy and possess, keep and defend the whole from all other persons, until wanted by the said Fletcher and Oldfield; provided that nothing herein shall prejudice any existing rights of the said Fletcher and Oldfield.

*Alpena, June* 8, 1860.      GEORGE N. FLETCHER.
           J. K. LOCKWOOD.
Witness: S. M. NOXON.     J. OLDFIELD.

[REVERSE SIDE.]

It is hereby agreed and stipulated between the parties hereto that the within described premises shall be divided by a proper survey, so that J. K. Lockwood shall have the north or upper quarter, John Oldfield his quarter next adjoining, and George N. Fletcher the lower or south half of the same, measuring in distance from point to point, as described within.

          GEORGE N. FLETCHER.
          JOHN OLDFIELD.
          L. M. MASON & Co.,
Witness: S. M. NOXON. ·     Per J. K. LOCKWOOD.

†This indenture, made and entered into at the city of Detroit, in the

were made long after Bassett received his deed and went into the possession of the property thereunder and actually occupied a portion of the premises contended for ; and any deed given in pursuance of such agreement was in fraud of Bassett's right and those claiming under him, unless they

county of Wayne, and state of Michigan, on the twenty-second day of January, in the year of our Lord one thousand eight hundred and sixty-eight, by and between Lorenzo M. Mason, of the said city of Detroit, and John S. Minor, of the same place, and James K. Lockwood, of the county of Alpena, all in the state aforesaid, witnesseth: that whereas, the said Mason, Minor and Lockwood have heretofore and do now own jointly certain real estate, consisting of village lots with buildings and mills thereon, as hereinafter described; and whereas, the interests of the parties · in the said property is in the following proportions, namely: Lorenzo M. Mason one-half, John S. Minor one-fourth, and James K. Lockwood one-fourth, and is to be divided and set apart in such proportions; and whereas, it is now agreed and determined by all the above-named parties to divide the same among the several owners above named: Now, therefore this indenture witnesseth, that to L. M. Mason there is hereby set apart and conveyed all the right, title and interest of John S. Minor and James K. Lockwood aforesaid, and they do hereby forever quitclaim to the said Mason the following described property, namely: The water-mill, so called, described as water-power number one; also a parcel of land lying between block number twenty-six and the river, being south part of block 44, north of Tenth street; also lots number 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14, with the boomage in front, and the undivided one-fourth of the water-power dam, situated on said property, excepting so much from the south end of said water-power number one as will be south of a line drawn or run from the south-east corner of lot number 10, in block number 19, and the easterly end of the water mill dock in the Thunder Bay river; also lots number one and two, in block number 21; also lots 13 and 14, in block number one; also lots 1 and 2, in block number 2; also the Lester mill, so called, situate on lots number 8, 9, 10, 11, 12 and 13, in block number 8, which said lots be· long to George N. Fletcher; and also lot number 5, in block number 6, according to the recorded plat of the village of Alpena, in the county of Alpena, and state of Michigan, with all and ·singular the hereditaments and appurtenances thereunto belonging, to have and to hold the same to his own proper use and benefit, forever.    And to John S. Minor there is hereby set apart and conveyed all the right, title and interest of Lorenzo M. Mason and James K. Lockwood aforesaid, and they do hereby forever quitclaim to the said Minor, the following described property, namely: Island mill, so called, with all the middle ground north of the north line of lot number 28, extended across the middle ground; also lots number 1, 2, 3, 9, 10, 11, 12 and 13, in block 15, extended across the river to the channel bank of the west side of Thunder Bay river; and lots numbers 7 and 8, in block number 15, and that part of water-power number 1 lying south of a line running from the south-east corner of lot number 10, in block number 19, to the easterly end of the water mill dock, reserving James K. Lockwood a passage-way from the main river to the head of the Home mill boom, at the west end under the bridge, of a suitable width for running logs, say 25 feet; also the east half of lot number 34, in block number 8; and also the Ox Bow, so called, being lot number 6, old survey, or the north part of lot number 9, new survey, containing six acres, more or less; also lots number 2, 3, 4, 9 and 10, in block

were given to him or to his grantees, and any title resting upon such conveyance, of course, would be worthless, and such appears to be the character of the title through which the plaintiff claims, and it cannot be sustained. The description of the premises claimed, contained in the declaration, is very imperfect; but whether sufficient or not to entitle the plaintiffs to maintain their action it is not now necessary to determine.

The judgment of the circuit court must be affirmed, with costs.

GRAVES, C. J. and COOLEY, J. concurred.

CAMPBELL, J.    I concur in the result.

---

number 13, all according to the recorded plat of the village of Alpena, in the state and county aforesaid, with all and singular the hereditaments and appurtenances thereunto belonging, to have and to hold the same to his own proper use and benefit, forever.    And to James K. Lockwood there is hereby set apart and conveyed all the right, title and interest of Lorenzo M. Mason and John S. Minor aforesaid, and they do hereby forever quitclaim to the said Lockwood the following described property, namely: The Home mill, so called, with site, consisting of lots number 24, 25, 26, 27 and 28, to extend from River street across the south channel and middle ground, so called, to the channel bank of the south channel of Thunder Bay river; also lots number 29, 30, 31, 32 and 33, to extend across the south channel to the said middle ground, containing the boomage of the south channel to the lower side of the Island mill bridge; also the west half of lot number 34, all in block number 8; also a passage-way to be kept open and free for the passage of logs, under and from the west end of the Island mill bridge, to the east end of the water mill dock, and thence to the main channel of the river, of a suitable width for running logs, not exceeding 25 feet; also lots number 3, 4, 5, 6, 7, 8, 9 and 10, in block number 11, and lot number one, in block 13, according to the recorded plat of the village of Alpena, in the county and state aforesaid, with all and singular the hereditaments and appurtenances thereunto belonging, to have and to hold the same to his own proper use and benefit, forever.

All the said property herein described being in the county of Alpena and state of Michigan.    And it is hereby further stipulated and agreed, by and between all the above-named parties, that each of the several parties to whom the several lots and parcels of land are herein set off, divided and conveyed, shall have and hold the said lands and tenements to the said parties, their heirs and assigns forever.

In witness whereof, the said parties have hereunto set their hands and seals, on this, the day and year first above written.

|  |  |
|---|---|
| L. M. MASON. | [L. s.] |
| J. S. MINOR. | [L. s.] |
| J. K. LOCKWOOD. | [L. s.] |

Signed and delivered in presence of
F. E. DRIGGS,
J. P. WHITTEMORE.