THE BOARD OF PARK COMMISSIONERS v. ETNA TAYLOR, Appellant; THE BOARD OF PARK COMMISSIONERS v. M. B. KIMBALL and CARRIE M. WILLIAMS, Appellant; THE BOARD OF PARK COMMISSIONERS v. LENNA RUBINSON and LEON WALLERSTEIN, Appellants.

*Appeal:* CHANGE OF POSITION. Where it is conceded on the trial below, on an issue as to the right to accretions along a river bank, that the river at that point was a navigable stream and therefore the land in question extended to high water mark, the party making such concession cannot change his position on appeal and claim that the river at that point had never been navigable and that the land extended to the middle of the stream.

*Navigable Waters:* RIPARIAN OWNERS. The act of the government in meandering a stream and conveying the land with respect to the meander line is conclusive that the stream was navigable so far as the title of riparian owners is concerned.

*Conveyances:* DESCRIPTIONS: BOUNDARIES. Where a conveyance describes certain lots with reference to a plat, the plat for the purpose of the description becomes a part of the conveyance, and where the plat describes the lots as extending to a navigable stream, such stream constitutes an identified monument which will control the distances indicated by the figures on the plat, and the owner takes the land to high water mark.

*Navigable waters:* RIGHTS OF RIPARIAN OWNERS. One whose land is bounded by a navigable river is a riparian owner and he has the right to access to the stream for proper purposes, but this right does not prevent the exercise by the State of control over the banks of the stream. He also has the right to natural accretions, but be cannot extend his area by artificial filling and thus infringe upon the public right to the banks or bed of the stream.

*High water marks:* DETERMINATION. The line of high water mark, for the purpose of locating the boundary of a riparian owner where there are defined banks confining the stream at high water, is to be determined from the marks of the river itself along its banks.

**Adverse possession.** There can be no adverse possession of the beds and banks of a navigable stream the title to which is held by the State for the public benefit.

**Estoppel.** The levy and collection of taxes will not estop the State, or those claiming under it, from asserting title to the banks and bed of a navigable stream.

*Appeal from Polk District Court.*— Hon. Hugh Brennan, Judge.

Wednesday, July 11, 1906.

Rehearing Denied, Thursday, February 14, 1907.

These three actions are brought by the Board of Park Commissioners of the city of Des Moines to establish its jurisdiction and right of control for park purposes under chapter 179, Acts 28th General Assembly, over certain premises claimed by defendants as constituting a part of certain several lots to which they respectively have title. After a hearing on the merits there was a decree establishing in favor of plaintiff the jurisdiction and right of control as prayed as to each of the defendants, and the defendants prosecute their respective appeals. The cases are submitted on the same record and involve so nearly the same states of facts as to the questions in controversy that they may be disposed of as one case. *Affirmed.*

*Hager & Powell,* for appellants.

*Read & Read,* for Appellee.

McClain, C. J. By Acts 28th General Assembly, chapter 179, the Board of Park Commissioners of Des Moines is vested with jurisdiction and control for park purposes over the Des Moines river and the bed and banks thereof within certain limits which need not here be specifically described. To establish their jurisdiction and right of control, within the provisions of this act, over a portion of the

east bank of the river south of Walnut street bridge, these actions are brought, the claim being that defendants, who are owners of lots 1, 2 and 3 of block 5, Scott & Dean's addition to Ft. Des Moines, now within the corporate limits of the city, are unlawfully trespassing upon and occupying with buildings, sheds, and personal property portions of the river bank west of and outside the limits of their respective lots, and within the limits over which the Park Board has jurisdiction and right of control, and the plaintiff asks that defendants be enjoined and restrained from maintaniing buildings and obstructions on such portions of the river bank as are west of their respective lots and within the jurisdiction and control of plaintiff, and required to abate such buildings and obstructions as constituting nuisances. So far as these cases are concerned, there is no question but that plaintiff is entitled to the jurisdiction and control claimed in each case, unless the portions of the premises as to which defendants assert title are within the limits over which title is by them asserted, or have been added thereto by accretion or otherwise.

On the following page is a portion of the plat of Scott & Dean's addition, and shows block 5 bounded by Walnut street on the north and Front street, now known and described on the plat as First street, on the east, and extending south from Walnut street to the line of the alley in the next block east. South of this alley there is no platting of lots abutting upon the river, and Front or First street is bounded by the river. See *Boehler v. Des Moines,* 111 Iowa, 417.

Defendant's claim that their lots extend westward more than one hundred feet beyond the line indicating the western boundary of the lots on the plat and the controversy is over the defendants' titles to those extensions of their lots. The trial court found that the ownership of defendants was limited to lots having the dimensions indicated on the plat, and established the jurisdiction and right of control of plaintiff over the extensions of these lots claimed by the de-

BLOCK V. SCOTT AND DEANS ADDS.
PLAT BOOK B. PAGE 59.
AUDITORS OFFICE POLK Co., IA.

fendants west of the boundary indicated on the plat, and directed the removal of all obstructions on the ground and river bank west of said lines.

I. The foregoing statement fails to take note of a claim presented by appellants in their argument in this court

that the Des Moines river, north of the Raccoon Forks, and therefore along these lots as platted, is not and never was in law a navigable river, and that therefore defendants' lots extend to the middle of the channel of the river, regardless of the dimensions given on the plat. In the lower court it was conceded that the Des Moines river along this plat was a navigable river, and that defendants' lots extended only to high water mark, and the whole case was tried on this theory. We think that it is not competent for defendants now to change their position, for in doing so they preclude the plaintiff from making proofs, which it might otherwise have made, as to the character of the stream. But as we view it defendants could not under the record question the character of the river as navigable, for it is conceded that in the original government survey it was meandered, and its character as a navigable stream was thus established so far as the possible limits of defendants' lots are concerned. The action of the Land Department of the United States government in meandering the stream and conveying the land bordering on such stream with reference to the meander line is conclusive that the stream was navigable in such sense that the title of the riparian owners resting on such survey extended, under the rule in this State, only to high-water mark. *Rood v. Wallace,* 109 Iowa, 5; *Serrin v. Grefe,* 67 Iowa, 196; *Carr v. Moore,* 119 Iowa, 152.

*1. APPEAL: change of position.*

That the surveyors, in making the original United States survey, were required to determine the navigability of the stream in determining whether it was to be meandered, is apparent from Act May 18, 1796, chapter 29, " providing for the sale of land of the United States in the territory northwest of the river Ohio and above the mouth of the Kentucky river," which act was subsequently made the basis for the survey of land in Iowa. It was therein provided (section 2) that the land

*2. NAVIGABLE WATERS: riparian owners.*

should be surveyed in townships of six miles square by running north and south and east and west lines, unless where " the course of navigable rivers may render it impracticable, and in that case this rule must be departed from no further than such particular circumstances require." U. S. Comp. St. section 2395. And further in the same act (section 9) it is provided that " all navigable rivers within the territory to be disposed of by virtue of this act shall be deemed to be and remain public highways; and in all cases where the opposite banks of any stream not navigable shall belong to different persons, the stream and bed thereof shall become common to both." 1 Stat. 468; U. S. Comp. St. section 2476. In the directions to surveyors issued by the General Land Office it was provided that " both banks of navigable rivers are to be meandered by taking the courses and distances of their sinuosities." Lester, Land Laws, page 714. There can be no doubt that the approval of the survey when made constituted a determination by the Land Department that the stream meandered was a navigable stream, and this determination is conclusive so far as the title of riparian owners is concerned. If defendants have title to any portion of the premises claimed by them west of the line indicated on the plat as their western boundary, it must be based on some other ground than that their lots extend by operation of law to the center of the Des Moines river.

II. On the other hand, it is contended for plaintiff that defendants are limited in the size of their lots to the dimensions shown on the plat, and in support of this contention counsel refer to the statute in force at the

3. CONVEYANCES: descriptions; boundaries.

time this plat was filed in 1849, by which it was provided that lots " intended for sale shall be numbered in progressive numbers, or by the squares in which they are situated, and their precise length and width, shall be stated on said plat or map." (Rev. St. Iowa Ter. 1843, chapter 147), and to the certificate of the surveyor to

the plat, in which it is recited that " courses of streets, distances, size of lots, and blocks [are] as marked upon the plat." Without doubt the plat is to be interpreted as showing that the east and west lines bounding lot 3 on the north and south are each 38 feet long, the east and west line between lots 1 and 2 is thirty-four feet long, and the south line of lot 1 is thirty feet long. It is conceded that the conveyances of these lots described them by number only, and not either by dimensions or by reference to the Des Moines river. But when a lot is thus described as on a map or plat to which reference is made, such map or plat becomes, for the purpose of description, a part of the deed and has the same effect as though it were incorporated into the instrument. *Nicolin v. Schneiderhan*, 37 Minn. 63 (33 N. W. 33). Therefore defendants' deeds, although they contain no calls to the Des Moines river, do, by reference to the plat, call for lots extending from First street west to the Des Moines river; for they are so represented on the plat. It is true they are also represented on the plat as of specified dimensions east and west; but where a monument is referred to, as, for instance, the shore of a river or lake, such monument, when identified and its location established, controls courses and distances in the description. *County of St. Clair v. Lovingston*, 23 Wall (U. S.) 46 (23 L. Ed. 59); *Erkens v. Nicolin*, 39 Minn. 461 (40 N. W. 567); *Spring v. Hewston*, 52 Cal. 442; *Liddle v. Blake*, 131 Iowa, 165. Where a river or lake is designated as the boundary, there is nothing left for private appropriation between the land described and the water; that is, the stream or lake constitutes the boundary, and not the line fixed on the plat by the courses and distances. *County of St. Clair v. Lovingston*, 23 Wall. (U. S.) 46, 63 (23 L. Ed. 59); *Watson v. Peters*, 26 Mich. 508; *Fletcher v. Thunder Bay R. Boom Co.*, 51 Mich. 277 (16 N. W. 645). These considerations dispose of the claim made for plaintiff that defendants are restricted to the exact line drawn on the plat as indicating their western

boundary, for that line indicates also that it is the eastern bank of the Des Moines river, and defendants' lots therefore extend to the river, regardless of the distances indicated by the figures on the plat. In this connection we may say that the testimony of Laverty, who, as surveyor, made and certified the plat in 1849, and was introduced as a witness on this trial, that he ran the line on the plat which designates the western boundary of the lots along the top of the river bank, and without regard to the high-water line, is wholly immaterial. Parol evidence of his intention as indicating the intention of the owners for whom he acted in making the plat could not affect the construction of the plat itself. It is clearly not competent to prove now, for the purpose of varying the legal effect of the plat, the intention of the owners inconsistent with the plat. We have no difficulty in reaching the conclusion that the western boundary of defendants' lots at the time the plat was made was the high-water mark of the Des Moines irver.

III. As defendants claim under chains of title calling for western boundaries of their lots on the Des Moines river, they are riparian owners, and their rights, with reference to

4. NAVIGABLE WATERS: rights of riparian owners.

the exercise of jurisdiction and right of control of the bed and banks of the river in plaintiff, must be determined in view of such riparian ownership. One of the rights of the riparian owner is access to the stream for proper purposes. Gould, Waters (3d Ed.) section 149. But by the statute defining the jurisdiction and right of control which plaintiff may exercise over the banks of the Des Moines river there is no attempt to cut off this right of access. On the contrary, it is specifically provided that the vested rights of riparian owners shall not be affected by the act. Acts 28th General Assembly, chapter 179, section 1. But this right of access does not prevent the exercise by the State, or by plaintiff under authority of the State, of jurisdiction and control over the banks, and in this State it is now well settled that this exercise of ownership and

control on the part of the State may extend even to granting of a right of way for a railroad between high and low water mark.   *Tomlin v. Dubuque, B. & M. R. Co.,* 32 Iowa, 106; *Musser v. Hershey,* 42 Iowa, 356; *Renwick v. Davenport & N. W. R. Co.,* 49 Iowa, 664; *Barney v. Keokuk,* 94 U. S. 324 (24 L. Ed. 224); *Railway Co. v. Renwick,* 102 U S. 180 (26 L. Ed. 51).   There is nothing in the decree interfering with any right which defendants may have in view of the conditions of the river adjoining their lots and the uses to which it may be put that deprives them of any riparian right of access.

It may be noticed in this connection that by act of Congress of 1870 the Des Moines river has ceased to be in law a navigable stream.   The effect of this statute upon defendants' right of access to the stream has not been discussed in this case and need not now be considered.   We have held, however, that the boundaries of abutting owners have not thereby been extended to the middle of the river, nor, on the other hand, have their rights to accretion been cut off.   See *Berry v. Hoogendoorn,* 133 Iowa, 437 and cases therein cited.

The riparian owner also has the right to accretions to his land gradually added by the action of the stream.   *Kraut v. Crawford,* 18 Iowa, 549; *Coulthard v. Stevens,* 84 Iowa, 241; *Stern v. Fountain,* 112 Iowa, 96; *Jefferies v. East Omaha Land Co.,* 134 U. S. 178 (10 Sup. Ct. 518, 33 L. Ed. 872).

Defendants contend that their western boundary, as it was when the plat was originally filed, has been subsequently changed by accretions, so that their lots extend further to the west than at the date of the plat.   The evidence does show that these lots have been extended to the westward by filling, but we find no evidence that they have been added to by the action of the water.   It is to be remembered in this connection that the title of the riparian owner goes only to high-water mark, and that in order to extend land by accretions the additions by the action of

water must be such as to change the high-water mark. Counsel contend that, even though the accretion is due to artificial causes, nevertheless it inures to the benefit of the riparian owner; and they cite several cases, the most pertinent of which are *Lovingston v. County of St. Clair,* 64 Ill. 56 (16 Am. Rep. 516); *Halsey v. McCormick,* 18 N. Y. 147; *Steers v. Brooklyn,* 101 N. Y. 51 (4 N. E. 7). But these are cases where there has been an actual accretion, although it may have been due to some artificial obstruction. There is no evidence in this case that the high-water line along defendants' lots has been changed to the westward by reason of any action of the water. On the contrary, we think it is clearly established that any extension of the lots has been due to filling placed along the bank by defendants themselves or by their consent. Now, we think it is well established that a riparian owner cannot encroach upon the banks of a navigable stream on which he is bounded by filling out his lots and thus infringing upon the banks or bed of the stream belonging to the public. *Illinois Cent. R. Co. v. Illinois,* 146 U. S. 387 (13 Sup. Ct. 110, 36 L. Ed. 1018); *Saunders v. New York C. & H. R. R. Co.,* 144 N. Y. 75 (38 N. E. 992, 26 L. R. A. 378, 43 Am. St. Rep. 729); *People v. Commissioners,* 135 N. Y. 447 (32 N. E. 139); *McKeesport Gas. Co. v. Carnegie Steel Co.,* 189 Pa. St. 509 (42 Atl. 42); *Revell v. People,* 177 Ill. 468 (52 N. E. 1052, 43 L. R. A. 790, 69 Am. St. Rep. 257). So far, then, as the area of defendants' lots has been increased by filling, no rights as against the plaintiff representing the State have been acquired.

IV. We have left, then, a simple question of fact: What was the location of the high-water mark between defendants' lots and the Des Moines river at the time of the filing of the plat in 1849? For this, as we hold, was originally the western boundary of the lots in block 5, and remains their western boundary in the absence of any change by accretion. The

5. HIGH WATER MARKS: determination.

testimony of witnesses who were familiar with the shore of the river in this locality at that time shows that from the general level of the land along the east side there was a steep declivity at an angle of about forty-five degrees down to near the low-water mark, where there was a sandy beach. The high water would cover the bank to near the top of the declivity, and there was no land west of the break in the general surface, which constituted the beginning of the declivity, which was suitable for agricultural purposes. There is some conflict in the evidence, which is not remarkable in view of the fact that the witnesses were testifying as to conditions existing from twenty to forty years prior to the time of the trial; but these facts we think to be significant: When buildings were first erected on the general level of these lots, the rear portions of them were on piles, and the water at times came up to and even under them. When the pilings were driven for the east abutment of the wooden bridge on Walnut street, which preceded the present bridge, these pilings were about as far east as the rear portions of these buildings. The east abutment of the present bridge is further west by one hundred and fifteen feet than the corresponding abutment of the previous bridge and the present owners of the lots have put in a row of piling from the wing of the present bridge running south, and have since that time filled and occupied their lots back to the piling. Laverty, the surveyor who made the original plat, testified that he ran the boundary line, indicated on the plat as the western boundary of defendants' lots, along the top of the river bank and inserted in the plat the correct distances from the street west to this boundary line. Excavations made on the east bank of the river adjacent to defendants' lots for a sewer, and borings made by expert witnesses on the western portions of defendants' lots, show that down below what is now high water in the river the soil consists of cinders and other filling material, and that the natural clay of the bank is not reached until the excavations and borings are below high-

water mark. It may not be possible to say now, in view of the testimony, just how far up the sloping bank was the usual water mark before the lots were filled; but we are satisfied that west of the boundary line, as fixed by the plat, there was a sloping bank unsuitable for agricultural purposes and up which high water came, and this is a sufficient basis, we think, for fixing the original so-called high-water mark which would constitute the western boundary of defendants' lots as the top of the bank represented by the boundary line on the plat. *Welch v. Browning,* 115 Iowa, 690; *Musser v. Hershey,* 42 Iowa, 356, 361; *Houghton v. C. D. & M. R. Co.,* 47 Iowa, 370; *Dunton v. Parker,* 97 Me. 461 (54 Atl. 1115); Gould, Waters (3d Ed.) section 46. The line of high-water mark in cases such as we have before us, in which it appears there are definite river banks confining the stream at high water, " is to be determined, not from human records, but from the records which the river makes itself." Houghton v. C. D. & M. R. Co., *supra.*

Some importance is attached in the testimony to certain cottonwood trees growing west of the buildings first erected on defendants' lots, but it appears that these trees were planted near the shore of the river at the ordinary stage of the water, and not above high-water mark, and that the nature of the trees is such that they will continue to grow, although their roots are submerged for a time each year by high water. We do not regard the existence of these trees as proof that their location was originally above high water. Under the evidence as a whole we are satisfied that the decree of the lower court fixing defendants' western boundary to correspond with the line representing the western boundary on the plat and giving to defendants the area specified in the plat is correct.

V. There is some contention on behalf of defendants as to adverse possession and estoppel. But, as against the State, holding title to the beds and banks of navigable rivers for the public, there can be no

6. ADVERSE POSSESSION.

adverse possession. *Carr v. Moore,* 119 Iowa, 152, 159; *Chicago, R. I. & P. R. Co. v. Council-Bluffs,* 109 Iowa, 425.

As to estoppel it is sufficient to say that the State and plaintiff claiming under the State, could not be estopped by acts of city officials. *Simplot v. Chicago, M. & St. P. R. Co.* (C. C.) 16 Fed. 350 (5 McCrary, 158). And in general, to the effect that unauthorized acts of officials will not estop a municipal corporation, see *Cedar Rapids Water Co. v. Cedar Rapids,* 117 Iowa, 250; *McGillivray v. Barton,* 96 Iowa, 629; *Taraldson v. Lime Springs,* 92 Iowa, 187; *Solberg v. Decorah,* 41 Iowa, 501; *Gill v. Appanoose County,* 68 Iowa, 20. Thus the levy and collection of taxes on property will not estop a city from asserting title to the property for the public. *Cedar Rapids v. Young,* 119 Iowa, 552. In this case there is no evidence that defendants were taxed otherwise than on the lots to which they had title under the plat.

7. ESTOPPEL.

On the whole, we are satisfied of the correctness of the decree of the lower court, and it is *affirmed.*