# T. L. WRIGHT LUMBER COMPANY, Appellant, v. RIPLEY COUNTY.

### Division One, February 20, 1917.

1. **CONVEYANCE: Island in River: Not Surveyed: Reservation.** An unrestricted deed conveying land bordering on a river, or a Government patent conveying land adjacent to a non-navigable river, conveys all accretions thereto; and a patent conveying by Government subdivisions lands bordering a non-navigable river conveys all land between the meander line of the shore and the middle thread of the river, unless previous to the issuance of the patent the Government surveyed such lands as governmental subdivisions, or expressly reserved them when not surveyed.

2. **NAVIGABLE STREAMS: Current River: Judicial Notice.** The court takes judicial notice of what streams are navigable and what are not navigable. Current River is not a navigable water of this State, and will not be conceded to be such although appellant admits it to be in his brief.

3. **APPELLATE PRACTICE: Inadvertent Admission in Brief.** An admission in the record by counsel for appellant which is contradictory of the whole theory of his case and of his brief and argument based upon a contrary fact, will be considered on appeal as having been inadvertently made, or as a clerical error in the writing or printing of the record.

4. **PUBLIC LANDS: Priority of Field Notes.** The field notes of United States surveys of public lands made prior to their conveyance to the State or to private persons, will control in ascertaining corners and lines, even though the monuments established by the surveys cannot be found.

5. **———: Island in Current River.** A small island of a few acres in Current River, east of the middle thread of the river, existing prior to 1821 when the Government surveyed the surrounding lands, the field notes showing meander lines running along or near the banks of the river, but neither crossing nor touching the island and the survey in no wise mentioning or including but entirely ignoring it, was included in the patent of the fractional Government sub-division of the shore land on the east bank made in 1849, which did not reserve it. It was not reserved and relinquished to the State upon the admission of Missouri to the Union.

6. **———: ———: Purpose of Meander Lines: Include Islands and Overflow Lands.** Meander lines run by a Government survey along

or near the margin of a non-navigable stream were run for the purpose of ascertaining the exact quantity of upland to be charged for, and not for the purpose of limiting the title of the patentee to such meander lines. Low and overflow lands and small islands within the banks of such a river were included by a patent conveying the land by Government fractional sub-divisions.

7. SURVEYS: No Established Corner. A survey which does not begin at a corner established by the Government, or a corner established as required by Sec. 11322, R. S. 1909, though it otherwise pretends to follow field notes from another corner assumed to be right, is not admissible in evidence, and cannot be used to discredit an official survey made in pursuance to an order of the circuit court under the mandate of Secs. 10184 and 10188, R. S. 1909.

Appeal from Cape Girardeau Circuit Court.—*Hon. Frank Kelly,* Judge.

REVERSED AND REMANDED.

*Chas. B. Butler* for appellant.

(1) When the Government of the United States has conveyed its lands along the bank of the river and has sold and conveyed such land by Government subdivisions, its patent conveys all the land between the meander line and the middle thread of the river, unless previous to such patent it has surveyed such lands as governmental subdivisions or expressly reserves them when not surveyed. Jeffries v. Land Co., 134 U. S. 178; Covley v. Golden, 117 Mo. 33; Stoner v. Royar, 200 Mo. 444. (2) Field notes of United States surveys of public lands will control in ascertaining locations, even though the monuments established by the Government surveyor cannot be found. Bradshaw v. Edelen, 194 Mo. 640; Carter v. Hamback, 139 Mo. 243. (3) The corners established by United States surveyors in surveying public lands are conclusive as to the actual location of the boundary lines of sections and such subdivisions thereof are authorized by the laws of the United States. Federetzie v. Baker, 193 Mo. 228. (4) A riparian owner on a navigable stream owns to the low watermark. Frank v. Goddin, 193 Mo. 390; Coveley v. Golden, 117 Mo. 33. (5) Islands in a stream belong to the holder of

title to lands under adjacent waters. United States v. Chandler-Dunbar Co., 209 U. S. 447.

*James F. Fulbright* and *Chas. L. Ferguson* for respondent.

(1) The United States relinquishes to each State, upon its admission to the Union, all proprietary interest in the soil under the waters of the navigable rivers and lakes, and all proprietary interest in the beds of navigable rivers and lakes, as incidental to the sovereignty of the State. Pollard v. Hogan, 3 How. 212; Hardin v. Shedd, 190 U. S. 519; Cooley v. Golden, 117 Mo. 51. (2) The title to and ownership of an island in a navigable river which at the time of the admission to the Union of the State in which such island is situate was small, of no apparent value, unsurveyed by the Government and which the Government surveyors did not deem of sufficient size and value to survey, passes to the State as a part of the bed of the river. Webber v. Axtell, 94 Minn. 375; United States v. Chandler-Dunbar Co., 209 U. S. 447; Railroad v. Butler, 159 U. S. 87; Whitaker v. McBride, 197 U. S. 510. (3) The proprietary rights in the beds of navigable streams may be reserved by the State or the ownership of the beds of navigable streams may be relinquished by the State to the riparian owner, the extent of the riparian owner's grant being construed and controlled wholly by the local law of the State as established by its Legislature or courts of final resort. Packer v. Bird, 137 U. S. 661; Barney v. Keokuk, 94 U. S. 324; Hardin v. Jordan, 140 U. S. 372; United States v. Chandler-Dunbar Co., 209 U. S. 447; Railroad v. Butler, 159 U. S. 87; Kaukanna Co. v. Green Bay & Miss. Co., 142 U. S. 254; Shively v. Bowlby, 152 U. S. 1. (4) In Missouri the riparian owner of land bounded by a navigable stream owns only to low watermark. Benson v. Marrow, 61 Mo. 351; Cooley v. Golden, 117 Mo. 34; Perkins v. Adams, 132 Mo. 131; McBane v. Johnson, 155 Mo. 191; Moore v. Farmer, 156 Mo. 47; State ex rel. v. Longfellow, 169 Mo. 109; Frank v. Goddin, 193 Mo. 390; Stonar v.

Royar, 200 Mo. 451. (5) The general rule adopted by both State and Federal courts is that meander lines are not run as boundaries of the tract surveyed, but for the purpose of defining the sinuosities of the banks of the stream and as a means of ascertaining the quality of land. The stream or other body of water and not the meander line as actually run on the ground is the boundary. 5 Cyc. 898; Railroad v. Schurmen, 7 Wall. 272.; Horne v. Smith, 159 U. S. 40; Hardin v. Jordan, 140 U. S. 371; Jefferis v. Land Co., 134 U. S. 178; Frank v. Goddin, 193 Mo. 390. (6) In Missouri the riparian owner owns only to low watermark and where the stream is the boundary of a grant, it remains the shore owner's boundary no matter how far the water line shifts either inwardly or outwardly. Frank v. Goddin, 193 Mo. 190.

WOODSON, J.—The plaintiff brought this suit in the circuit court of Ripley County, under section 2535, Revised Statutes 1909, against the defendant, to ascertain and decree title to the land described in the petition —the same being a small island in Current River, consisting of about five and one-half acres, near the city of Doniphan, Missouri. The judgment was for the de-- fendant, and the plaintiff appealed the cause to this court.

The plaintiff's evidence tended to show that the United States patented the land on January 1, 1849, to Lemuel Kittrell, and that through mesne conveyances the plaintiff, on October 27, 1906, acquired title to the same. That the island in question was in existence at the time, and long prior to 1821, the date of the admis-- sion of Missouri into the Union. That it lies in said river opposite the southwest fractional quarter of the northeast fractional quarter of section twenty-seven, township twenty-three north, range two east, in Ripley County, Missouri.

D. K. Ponder testified that in the year 1842 the island then existed, and that then there were trees a foot and one-half through growing on it.

Thomas Mabrey testified that the island was there in 1859 and has been there ever since.

T. L. Wright testified that he had known this island for forty years and that there were standing trees on it more than two hundred years old; and that the timber on the island and on the adjacent land showed no difference as to age.

The photographs introduced in evidence tend to show that the island is not of recent origin.

The field notes of the survey made by the United States in 1821 do not show that this island existed, but the report of this survey does not show that the meander line ran across or up the island in the direction the river runs.

A report of a survey made by W. H. Hippolite, a civil engineer, by order of the circuit court of Ripley County in 1895, to be used in another case involving land in this same vicinity, requiring the establishment of the certain lines and corners made and established by the United States in 1821, was introduced in evidence. (While the record does not, in so many words, state that this survey was ordered made under section 10207, Revised Statutes 1899, providing for the establishment of lost Government corners, etc., yet that fact, I gather therefrom, is clearly inferable.)

The report, which is quite lengthy, but in so far as it is here material, reads as follows:

"Dear Sir:

"As per your order of court of the April term, 1895, ordering me to make an accurate survey in the case of D. K. Ponder v. J. F. Page, beg to advise that I have this day completed said survey and made the following report of same:

"In company with the plaintiff and defendant, in the case, together with a number of old residents of this (Ripley Co.) I obtained all available information of Govt. corners and witness-trees in the vicinity, by actual research on the premises, and after getting which, began my survey for the accurate location of the east and west quarter section line of section 26, township 23,

North, range 2 East, of the 5th P. M., said line being the one in dispute."

Then follows a long report of the courses, distances, corner stones, witness-trees, etc., found by him, and how from those courses, distances, stones and trees he established the section line above mentioned and the quarter section corner of the southeast corner of the southwest fractional quarter of the northeast fractional quarter of said section twenty-seven.

The old corner stones, witness-trees, etc., with the new ones established by Hippolite, were shown by said report, all agreeing with the contention of plaintiff in this case.

J. H. Greason testified that he was a civil engineer, and a graduate of the Missouri University; that he made the plat offered in evidence appearing in the abstract, which is too large to be set out in this statement of the case. That he was familiar with island designated thereon; that he ran the meandering line shown on said plat-indicated by a light pencil line, passing along the island up and down the river, and through stations marked thereon six and seven. That he found quarter section corner of the southeast corner of the southwest fractional quarter of the northeast fractional quarter of said section twenty-seven, before mentioned, and established by Mr. Hippolite; that he had with him Hippolite's field notes, which he followed; that when he came out on the line between twenty-six and twenty-seven, he found at the corner a Government tree, and that he ran this line, indicating, up to the northeast corner of said section twenty-seven. He then states in detail how he surveyed the river, island and lands shown by said plat; that it was correct and corresponded in the main with that of Hippolite.

That the Government field notes do not show the existence of the island; that he was familiar with the rules of the Government in surveying islands in rivers, lakes, etc., and produced and read them to the court; that he followed those rules in making the survey mentioned, except he showed the island in his plat.

Wm. M. Andrews, a civil engineer and graduate of the University of Indiana, testified that he ran the meander line of Current River in said section twenty-seven and surveyed the island in question; made the plat introduced in evidence, and that the meander line ran through stations five, six and seven on the plat, said stations being on said island; and that he took the measure of distances from the United States field notes and Hippolite's survey.

That the plaintiff and those through whom he claims title, have been in the actual, open, notorious, exclusive and adverse possession of the island for more than twenty years just before the institution of this suit, claiming title thereto, and had paid all the taxes against the same during that period.

The evidence for the defendant tended to show the following facts:

That Current River was a navigable stream; that the river runs in a southeasterly and northwesterly direction at that point with one of the channels running on the east and one on the west side of the island.

In 1821, the United States Government had surveyed and platted the lands upon each bank of the river in that vicinity. As far back as the memory of man runneth not to the contrary, the island had existed at that point. That fifty years ago it was a small, narrow strip of land, covered with small brush and trees, and in 1842 the island was about a quarter of a mile in length, running up and down the river, and about four hundred feet in width; but its exact size at the date the United States survey was made, is not shown. In later years the accretions to the island have increased its area to some ten or twelve acres.

That this island was not noted in the field notes in the United States Survey and no representation of the island was made on the plat constructed by the Government from those field notes. The island, as such, is not mentioned in the patent from the United States to Kittrell, nor in any of the mesne conveyances through which the plaintiff claims title thereto.

The defendant introduced S. P. Rodebaugh as a witness, who testified he was a surveyor and surveyed the island, ran certain meander lines, and made the plats defendant introduced in evidence. That in tracing the meander lines he did not follow those made by the United States survey, but began at a stake (presumably set by him) on the south line of said section, did not measure the distance from there to the river, nor attempt to get the correct starting point.

He was asked:

"Q. I will ask you if you went into what is supposed to be the corner of the southeast quarter of section twenty-seven, the corner that was referred to by Mr. Andrews and Mr. Greason in their testimony? A. Yes, sir.

"Q. State to the court whether there is anything to indicate that to be the corner of section twenty-seven? A. I don't think the tree that Hippolite used is the correct tree; it stands in the wrong position, the place he calls for is too low and there is nothing but a hole cut in the tree; that is, there are no figures.

"Q. There are no evidences there to which he referred on which a man could reliably locate a corner? A. No."

I. The question presented for adjudication in this case is, in a sense, similar to that of accretions, in this: an unrestricted deed conveying land on the shore of a river will also convey all accretions thereto. The same is true where the United States conveys its lands adjacent to a non-navigable river, where it sells and conveys such lands by the Government sub-divisions, its patents convey all the land between the meander line on the shore and the middle thread of the river, unless previous to the issuance of the patent it has surveyed such lands as governmental sub-divisions, or has expressly reserved them when not surveyed. That proposition has been expressly decided by the Supreme Court of the United States and by this court. [Jefferis v. E. Omaha Land

*Lands in Non-navigable River.*

Co., 134 U. S. 178; Cooley v. Golden, 117 Mo. 33; Stoner v. Royar, 200 Mo. 444.]

In discussing this question, this court, in the case of Cooley v. Golden, supra, on page 54, said:

"The next inquiry in order is, what land did plaintiff's grantors acquire from the Government under their grant of the fractional section quarters, bordering on the Missouri shore of the river? These subdivisions on the side next to the river all have a common meandering line designating the river shore. In the recent case of Hardin v. Jordan, 140 U. S. 371, Mr. Justice BRADLEY in delivering the opinion of the court says, in regard to such lines: 'It has been the practice of the Government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines. It has frequently been held, both by the Federal and State courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that the waters themselves constitute the real boundary. [Railroad v. Schurmeir, 7 Wall. 272; Jefferis v. East Omaha Land Co., 134 U. S. 178; Middleton v. Pritchard, 3 Scam. 510; Canal Trustees v. Haven, 5 Gilm. 548, 558; Houck v. Yates, 82 Ill. 179; Fuller v. Dauphin, 124 Ill. 542; Boorman v. Sunnuchs, 42 Wis. 233, 235; Pere Marquette Boom Co. v. Adams, 44 Mich. 403; Clute v. Fisher, 65 Mich. 48; Ridgway v. Ludlow, 58 Ind. 248; Kraut v. Crawford, 18 Iowa, 549; Forsyth v. Smale, 7 Biss. 201; Illinois Revised Statutes, secs. 2395, 2396.] . . . It has never been held that the lands under water, in front of such grants, are reserved to the United States, or that they can be afterwards granted

out to other persons to the injury of the original grantees.' ''

The following cases cited in effect hold that when the United States surveys its lands along the banks of a non-navigable river, and has sold and conveyed such lands by sub-division, its patents convey the title to all the lands lying between the meander line and the middle thread of the river, unless previous to the issuance and delivery of such patent, it has also surveyed such lands as Government sub-divisions or has expressly reserved them when not surveyed. [Webber v. Boom Co., 62 Mich. 626; Fletcher v. Boom Co., 51 Mich. 277; Granger v. Avery, 64 Me. 292; Jones v. Soulard, 24 How. 41; Middleton v. Pritchard, 3 Scam. 510; Chandos v. Mack, 77 Wis. 573; Railway v. Schurmeir, 7 Wall. 272; Jefferis v. East Omaha Land Co., supra.]

The opinion then proceeds, and holds that as to navigable streams, and where the tide ebbs and flows, the rule is otherwise; the patent only conveys the land to the shore line.

In the case of Stoner v. Royar, supra, this court held that Congress did not by act prior to 1855 vest in the State the title to surveyed islands in the Missouri River, but clearly indicating that if unsurveyed or unreserved it would have conveyed it.

But counsel for defendant contend that under the admission of counsel for plaintiff that Current River is a navigable stream, the company, under the authorities cited, had never acquired any title to the island in controversy, and therefore the judgment of the trial court was correct and should be affirmed.

It does appear from the record that counsel for plaintiff made that admission, yet the whole theory of his case, brief and argument is based upon the fact that said river is not navigable, so we are driven to the conclusion that the admission was inadvertently made, or as written and printed was a clerical error, and should state that it was a non-navigable river; otherwise, counsel would be placed in the nonsensical position

of making one admission and citing authorities in support thereof which destroy every vestige of his case.

But independent of that, counsel for both parties know, and this court will take judicial notice of the navigable and non-navigable waters of this State. We had this question before this court in the case of State ex rel. v. Taylor, 224 Mo. 393. On page 483, the court said:

"And since this district was organized subsequent to the passage of the Act of 1903, it becomes unnecessary for us to determine whether or not section 8278, Revised Statutes 1899, authorized the county court to construct, straighten, widen, alter or deepen the Chariton River, a *natural stream,* etc., for the reason that said section was not then in force, but the Act of 1903 which in express terms authorized its improvement, provided it was not a navigable stream within the meaning of that act.

"But counsel for relators insist that even though the court should be of the opinion that the Act of 1903, p. 234, authorized the county court to improve a natural stream, still that act had no application to the Chariton River, for the reason that the act itself in express terms exempts its application to all navigable rivers, to which class they contend Chariton River belongs.

"There is no pretense that said river is in fact navigable, but the contention it that it is in law a navigable stream. The basis of this contention is an act of the Legislature passed in the year 1845 (Laws 1845, p. 299). That act reads as follows:

" 'That the Grand Chariton River is hereby declared a public highway from its mouth, where it empties into the Missouri River, to the northern boundary of the State of Missouri; provided, however, that this act shall not be so construed as to affect the right of any person or persons who now have, or may hereafter have, a grist-mill or other machinery constructed on said river.'

"There is nothing in this record nor in any public document or history of the State, to which our attention

has been called, showing that the Chariton River in question is the Grand Chariton mentioned in the Act of 1845. It might be argued that they are one and the same river, for the reason that there is but one Chariton River in the State, and therefore the river in question was the river the Legislature had in mind. Assuming that to be true, the question then is, is the Chariton River a navigable river within the meaning of the Acts of 1903 and 1905?

"The Act of 1845 does not so declare it to be a navigable river. The declaration there is that it is 'a public highway.' Mr. Webster defines the word 'highway' as 'A public road; a way open to all passengers. Syn.—Way; Road; path; course.' And he defined the word 'navigable,' as, 'admitting of being navigated; affording passage to vessels—as a navigable river.'

"The substance of the legal definition of the latter word, as given by Mr. Burrill, is, by the common law, a river is considered navigable only so far as the tide ebbs and flows into it. That is also the doctrine in several States, but not of this State. Here all streams which are actually capable of floating and of permitting the passage of ordinary boats upon the bosom of their waters are considered navigable rivers. [Hickey v. Hazard, 3 Mo. App. 480; O'Fallon v. Daggett, 4 Mo. 343.]

"One of the elementary rules of statutory construction is, the courts should give to the words of the statute their plain or ordinary and usual meaning, the presumption being that the Legislature used them in that sense.

"In the light of these definitions and well established rules of interpretation, can it be said that the Legislature intended to declare the Chariton River to be navigable by the use of the words in the Act of 1845 'a public highway?' We think not, principally for the reason that it was not navigable as a matter of fact, and to so construe the act in question would be to convict the Legislature of not only doing a useless thing, but

also of enacting a most foolish statute, which is not tolerated by the canons of statutory construction.

"If we view this act in the light of numerous other acts of similar import, enacted about that time, it will show that the Legislature was simply trying to declare the channels of all such streams to be public highways so as to preserve the free flow and to preserve the use of the waters thereof unto the millers who had constructed grist-mills or other machinery along their banks.

"The following among other acts are similar in character: Acts of 1839, pp. 81, 87, 88; Acts of 1841, pp. 114-115; Acts of 1843, pp. 69-70; Acts of 1848, pp. 120-121; Acts of 1855, pp. 474, 538 and 625.

"The Act of 1839 declared all that part of Fourche-a-curtois Creek below Sawyer's Mill to be a 'public highway.' And the Act of 1841 declared Appel Creek from its mouth to Ingram's Mill to be 'a navigable stream,' and so on to the end of the list. Almost invariably these acts refer to some mill or mill-dam; and some of them, after declaring the stream to be navigable or a public highway, then, in the same section, expressly authorize the construction or maintenance of a mill-dam or draw across the same, for the purpose of propelling mills and other machinery, according to the general law of the State in relation to mills and mill-dams.

"When we consider the size, location and uses to which those streams were then being put, the conclusion is irresistible that the Legislature never once thought of constituting and declaring them and like streams to be public highways in the sense of navigability. No ordinary boat could ply any of them and but few of them at ordinary stages of water were capable of floating an ordinary canoe, while some of them during the dry season would scarcely float a pill box. To hold under this state of facts that it was the design of the Legislature to constitute and declare these small rivers and creeks to be navigable streams within the ordinary meaning of those words would be absurd and a reflection upon the intelligence of the Legislature and upon the court that should

so hold. But, as before suggested, the Legislature intended by those and similar acts to grant or license mill-owners along these streams who then had or might thereafter construct grist-mills along any of them, to construct and maintain mill-dams across the same for the purpose of conserving the waters thereof and generating power thereby with which to propel their mills or other machinery. This is the sensible view to take of all such acts, and the authority to construct and maintain dams across them negatives the idea that they were to be kept open as public highways in the sense of being navigable rivers. Even if navigable (which they were not) before the bridges authorized to be constructed were built, clearly they would not be after those obstructions were thrown across them. The construction and maintenance of bridges across these small streams is absolutely inconsistent with the idea of their navigability.

"We, therefore, hold that the Chariton was not a navigable river within the meaning of said Acts of 1903 and 1905, authorizing the organization of drainage districts and the construction of drains as provided for thereby. Consequently, we also hold that neither of said acts exempted the Chariton River from the operation of the drainage laws of the State."

The opinion then proceeds to consider the proposition as to whether or not the Legislature of this State had the authority to declare that river a navigable stream, etc.

The Act of February 24, 1855 (Laws 1855, p. 181), declaring Current River a navigable stream is similar to the acts before mentioned; also to many other acts of the Legislature declaring numerous other small streams and creeks of the State navigable.

We are, therefore, of the opinion that even though it be conceded that the admission regarding Current River being navigable, was not a clerical error, yet as before stated, it is not in fact or law a navigable stream. It might as well be contended that an admission to the effect that the Missouri River is not navigable, would thereby wipe out the law of the State regarding such

streams, as to wipe it out by admitting that Current River is navigable.

The State has more than a passive interest in such rivers; they play an important part in lands and land titles also regarding the rights of the State to use them in connection with the construction of proper levees and drains for the protection of the public health and against high water and overflow, etc.

Current River is not navigable and we are not going to let this case go off on the admission that it is, and hereafter be plagued in the future by an opinion of this court holding that it is such, because, perhaps, counsel for plaintiff in this case admitted it to be such.

Returning to question under consideration before this digression:

It is well settled in this State that the field notes of the United States surveys of public lands made prior to their conveyance to the State or to private persons, will control in ascertaining locations of corners, lines and locations, even though the monuments established by the United States cannot be found. [Bradshaw v. Edelen, 194 Mo. 640; Carter v. Hornback, 139 Mo. l. c. 243.]

In the case at bar, the report and surveys made by Hippolite and other engineers introduced in evidence by the plaintiff, were based upon the field notes, meander lines and such of the monuments then existing, established by the United States Government, which show that the island in controversy, which all the evidence tended to show was in existence and had been long before the date of the admission of this State into the Union, had never been surveyed by the Government, and said field notes and monuments themselves clearly show that the meander lines made by the United States ran along or near the banks of Current River, and did not cross, touch or undertake to survey this island in any manner whatever, but ignored it just as the Government ignores all other low and overflowed land lying below the meandering lines, and within the banks of such a river. As a rule, such lands are so small and

comparatively worthless that they are not considered by the Government in making surveys of the public lands, and when sold no charge is made for them. Of course, if there are large bodies of such lands worthy of consideration, then they are surveyed as other public lands are, and sold and conveyed as such.

The only evidence tending to disprove the foregoing facts is the testimony of S. P. Rodebaugh, a witness introduced by defendant, and a survey of the island made by him.

This evidence is wholly without probative force, for the reason that he stated that he did not start his survey from a corner established by the Government, nor a corner established by him, as required by section 11322, Revised Statutes 1909, but from a stake mentioned, indicated by a mark on his survey. This court in the case of Clark v. McAtee, 227 Mo. 152, in express terms held such a survey to be absolutely void, and not admissible as such; and for the same reason, the testimony of Rodebaugh was equally devoid of all weight, because he did not pretend to know where the true corner was, but assumed the stake mentioned was the true corner; if it was not, it being the basis of his testimony, then, of course, his testimony was worthless, the same as his survey.

To show the utter worthlessness of his testimony, he went to the length of discrediting the survey made by Hippolite, an official survey made by order of the circuit court, presumably under the mandate of section 10184, Revised Statutes 1899, as the court had no other authority to order it, and which by section 10188, Revised Statutes 1899, is made an official survey and required to be filed with the Recorder of Deeds in a well-bound book, indexed, etc., and declared to be competent evidence, etc.; and that discredit was not only based upon the starting point mentioned by him, but it was contradicted by witness-trees marked by the Government surveyors, as disclosed by their field notes and meandering lines. He disposes of the tree by simply saying: "It stands in the wrong place, the place he

calls for is too low and there is nothing but a hole cut in the tree; that is, there are no figures.''

As previously stated, that tree was located as the Government witness-tree by the field notes and meandering lines made by the United States surveyors, and by a survey made by Hippolite, starting from a corner established by him, as provided for by section 11322, Revised Statutes 1909, same as section 10207, Revised Statutes 1899.

There are other questions presented and discussed, but the view we have taken of the case renders it unnecessary for us to notice them.

For the reasons stated, the judgment of the circuit court is reversed and the cause remanded.   All concur.