J. Paul BURKE and Mary C. Burke, his wife, Plaintiffs-Respondents,

v.

R. L. COLLEY and Lorene Colley, his wife, Defendants-Appellants.

No. 9389.

Missouri Court of Appeals, Springfield District.

May 18, 1973.

James R. Hall, Doniphan, for plaintiffs-respondents.

Hyde, Purcell, Wilhoit & Edmundson, William Darmstaedter, II, Poplar Bluff, for defendants-appellants.

BILLINGS, Judge.

In this court-tried case title to real estate was quieted in plaintiffs and in a separate count plaintiffs had judgment against defendants for money damages for the conversion of gravel from the lands involved. We reverse and remand.

As in most cases involving boundary disputes, plaintiffs and defendants are neighbors with their respective farms being located in Ripley County. And it is the cool, clear and sparkling waters of many a float fisherman's fondest memory[1]—Current River—and its rise and fall over the years, which has given rise to the present controversy. Plaintiffs occupy lands west of the river and claim ownership of lands extending beyond the east bank, whereas defendants occupy lands east of the river, contend they own to the river, and that plaintiffs' easternmost boundary is the west bank of the river.

Current River begins its 250 mile southerly sojourn in Texas County, Missouri, and empties into Black River in Randolph County, Arkansas. Webster's New Geographical Dictionary (1972), page 304. As it traverses the Missouri Ozarks and winds its way toward the Land of Opportunity it passes through the County of Ripley where a sign located on the courthouse lawn in Doniphan proudly proclaims to the world: "Ripley County—Where History Is Preserved and Nature Stands Revealed."[2]

---

1. In State v. Wright, 201 Mo.App. 92, 208 S.W. 149 (1919), this court took "judicial knowledge also, in a way, that it [Current River] is a fine fishing stream" and under stare decisis we adhere to that pronouncement a half-century later.

2. The writer can attest to the validity of this claim having judicially observed pigeons flying through opened windows into the high ceiling courtroom during the course of a trial. Aside from the obvious distraction, this caused court personnel,

A few miles south of Doniphan the Current bisects Section 25 and in the area of the parties' farms it runs southwest, then turns eastwardly, then northeasterly, back east, and then resumes a southerly direction. Thus, as variously described by witnesses, the river forms a "loop", a "bend", or possibly more appropriate from an ichthyological standpoint, "the shape of a fishhook".

In September of 1963 plaintiffs purchased Lots 6, 7 and 8 of the Southwest Quarter of Section 25 (together with other lands) from Mr. and Mrs. Pierce. In connection with the sale the premises were viewed by the plaintiffs, accompanied by Mr. Pierce. When they arrived at the west bank of the river Mr. Pierce told plaintiffs that part of his property was located "across the river". He did not explain how much of the land was so located and plaintiffs did not ask him. At the time they observed a gravel dredging operation along the east bank of the river and were informed by Mr. Pierce the operation was that of defendants.

Following their purchase the plaintiffs continued to observe the removal of gravel from the east side of the river by defendants and were aware that defendants claimed an interest in the property where the gravel was being dredged and removed.

Plaintiffs acknowledged in their testimony that defendants had actual possession of the disputed lands "across the river" from 1963 until the trial in May of 1972 and during this period continued to remove gravel and "controlled" the disputed area "openly and notoriously".

Defendant Lorene Colley, prior to her marriage to defendant D. L. Colley, was a member of the Meriell family. The Meriell's settled on lands east of Current River sometime in the 1800's and since their lands were located near the bend of the river this area became known as "Meriell's Bend". A 73-year-old river guide preferred the more descriptive term "Snaggy Bend" because of the number of "snags" present —"a lot of people won't go through it."

The defendants moved onto the Meriell lands "east of the river" in 1939. Lorene testified that her father was in possession of the lands for forty or fifty years before "we became heirs to it." Her husband testified he "had all of John Meriell's estate in my possession since 1942." In October of 1957 the defendants obtained a quitclaim deed from various parties [presumably from the heirs of John Meriell] and among the lands quitclaimed were Lots 10, 12 and 13 "East of the Current River" Section 25 and Lot 16 "East of Current River" in Section 36.

There was evidence that defendants had been removing and selling gravel from along the east bank of the river for a number of years. A witness called by plaintiff testified he had been buying and hauling gravel from this area since 1957 and that defendants represented themselves to be the owners. The witness said he had been familiar with "this property" all of his life [age 39] and during his lifetime the defendants claimed the property and on cross-examination testified as follows:

"Q. And would it be a fair statement to say that within your knowledge, that [defendants] have had continuous open, notorious and actual possession under claim of right to this land at least for thirty-nine years?

A. Yes, sir."

Defendants offered other evidence that they had charged fishermen fees for fishing along the east bank of the river; that they had cut and sold timber from the

---

jury and spectators some understandable concern. And "nature" was suddenly revealed on the 35th Judicial Circuit Court Reporter's stenotype carrying case before the pigeons were ousted by judicial edict

—and sheriff's deputies. On another occasion a wasp caused a sudden recess when it decided to explore the anatomy of the 36th Judicial Circuit Court Reporter via his pants leg.

area; parts of the area had been cleared by them and used for cattle pasture; and, some buildings had been erected along the east bank by them.

In their petition plaintiffs asked that the title to the lands conveyed to them in the Pierce deed be quieted in them and also sought damages for defendants' conversion of gravel over a six-year period. In addition to denying the allegations of plaintiffs' petition, the defendants claimed plaintiffs' lands were bounded on the east by Current River and that defendants were the owners of the lands lying east of the river by reason of adverse possession and accretion. Defendants did not seek a declaration that title be quieted in them.

In 1967 plaintiffs caused a survey of their property to be made by County Surveyor Vincent [deceased at time of trial]. This survey and Vincent's field notes, recorded in the office of Recorder of Deeds [§ 60.150, RSMo., 1969, V.A.M.S.] were received in evidence without objection and showed plaintiffs' lands to be located West of Current River with the river serving as their eastern boundary.

In 1969 plaintiffs engaged the services of then County Surveyor, Hardy Martin, and W. H. Ice, New Madrid County Surveyor and a registered land surveyor, to make another survey. Martin provided Ice with Vincent's survey and field notes and in addition Ice related he used government field notes, a photostatic copy of an official government plat of the township, and aerial photographs [none of which were introduced in evidence] to prepare what was variously described as a survey, map, and plat, and received in evidence, over objection, as plaintiffs' exhibit three. Martin and Ice acknowledged that they did not survey the property in question but visited the area on at least two occasions and "walked around over there and looked at it." The Ice plat extended Lots 6, 7 and 8 some distance east of the river and the judgment quieting title in plaintiffs followed the description shown on this plat in

establishing the east boundaries of plaintiffs' property—along what is designated on the plat as the 1821 west meander line of Current River.

While it is true § 60.150 makes a proper survey prima facie evidence the fact remains that the Vincent survey was deficient in that it fails to show it commenced at a corner established by the government, or, if lost, re-established pursuant to the statutory method. The rule continues to be in this state that "Evidence of a survey which is not definitely shown to have commenced from a corner established by the government or, if lost, re-established in accordance with statutes, is of no probative force." Carroz v. Kaminiski, 467 S.W.2d 871 (Mo. banc 1971); Grimes v. Armstrong, 304 S.W.2d 793 (Mo.1957); Klaar v. Lemperis, 303 S.W.2d 55 (Mo. 1957); Schell v. City of Jefferson, 357 Mo. 1020, 212 S.W.2d 430 (Mo. banc 1948). The Vincent survey was therefore incompetent and should not have been received in evidence.

As was said in Pioneer Cooperage Co. v. Bland, 228 Mo.App. 994, 75 S.W.2d 431 (1934), at 435, after setting forth the above rule: "A surveyor's testimony is never receivable except in connection with the data from which he surveys, and, if he runs lines, they are of no value, unless the data is established from which they are run and must be distinctly proven, or there is nothing to enable any one to judge what is the proper result. . . . A survey made by the county surveyor without giving the courses and distances to the points or lines from which he established the points and lines given in the survey as required by the statute is not admissible as an official record [citing cases]."

The exhibit prepared by Ice and his testimony relative thereto are of no probative force to delineate the boundaries of the properties involved. The exhibit was not tied to a government marker or legally re-established corner. It had as its underlying basis the Vincent survey and

we have held the latter fails to meet the requisite legal standard. In addition, the Ice exhibit was based on assumption and conclusions from documents which were not offered in evidence. "Even the testimony of a surveyor as to the location of boundary lines is not to be received unless the data from which such lines are run is produced and proved." Barnhart v. Ripka, 297 S.W.2d 787, 792 (Mo.App.1956); See also Kelley v. Absher, 210 S.W.2d 531 (Mo.App.1948). Finally, no survey was in fact made by Hardy and Ice.

■ Current River has been held to be a non-navigable stream. T. L. Wright Lumber Co. v. Ripley County, 270 Mo. 121, 192 S.W. 996 (1917). Thus, aside from defendants' claims of adverse possession and acquisition by accretion, the rule is initially applicable that when the United States surveyed its lands along the banks of the river and sold and conveyed such lands by subdivision [lots], the government patent conveyed the title to all of the lands lying between the meander line and the middle thread of the river, unless prior to the patent the government surveyed such lands as subdivisions or expressly reserved them when not surveyed. Patton on Titles, § 66, pp. 247–252; T. L. Wright Lumber Co. v. Ripley County, supra. In the event of another trial the court should have the benefit of the United States government survey. §§ 60.350, 60.360, 60.370, RSMo., 1969.

■ Defendants' evidence of adverse possession and accretion of lands east of the river is likewise wanting since without proper survey before us we cannot locate such lands except for transcript references to "across the river", "this land", "that land", "this property", "over here", "to the area that we're talking about". In this connection the parties should keep in mind that there may be a review of the case, and should correlate the statements of witnesses with any exhibits being used in the examination as carefully as possible by means of some mark or symbol, or other

identification, on the exhibit. State v. Hill, 373 S.W.2d 666 (Mo.App.1963).

Since the judgment quieting title must be reversed it follows that the judgment allowing damages for the conversion of gravel from the lands in dispute must also be reversed. The judgments are reversed and the cause remanded.

TITUS, C. J., and STONE and HOGAN, JJ., concur.