Oscar **CANTRELL** and Leona
Cantrell, **Respondents,**

v.

BANK OF POPLAR BLUFF, **Appellant.**

No. 14112.

Missouri Court of Appeals,
Southern District,
Division Three.

Dec. 30, 1985.

Ted M. Henson, Jr., Poplar Bluff, for appellant.

James E. Spain, Hyde, Purcell, Wilhoit, Spain, Edmundson & Merrell, Poplar Bluff, for respondents.

CROW, Presiding Judge.

A jury awarded Oscar Cantrell and Leona Cantrell ("plaintiffs") $25,000 actual damages and $25,000 punitive damages against the Bank of Poplar Bluff ("the Bank"). Judgment was correspondingly entered. The Bank appeals.

The suit arose from the sale of a tract of real estate by the Bank to plaintiffs for $56,000. Plaintiffs alleged that the Bank's vice president and loan officer, Danny Stucker, who handled the transaction for the Bank, had represented to them that the north boundary of the tract lay some 100 feet north of the rear of a dwelling house situated on the tract. Plaintiffs further alleged that after they signed the contract to purchase the tract, but prior to the closing, a survey ordered by Stucker at plaintiffs' request revealed that the north boundary in fact lay beneath a deck attached to the rear of the house. Stucker, according to plaintiffs, learned of the result of the survey just hours before the closing, but failed to disclose the result to plaintiffs, who were unaware thereof. Stucker proceeded to close the sale, accepting plain-

tiffs' $56,000 check and delivering them a deed.[1]

The Bank maintains that the trial court erred in (1) receiving in evidence the testimony of the surveyor and his assistant regarding the north boundary, in that the survey "was not shown to have commenced from a corner established by the government," (2) denying the Bank's motion for a directed verdict at the close of all the evidence, in that plaintiffs' evidence regarding the location of the north boundary was "of no probative force because the survey was not shown to have commenced from a corner established by the government," and (3) giving the verdict directing instruction, in that it improperly deviated from M.A.I. 23.05 [1981 Revision].

The evidence, viewed favorably to the verdict and accorded the benefit of all favorable inferences reasonably to be drawn therefrom, with contradictory evidence disregarded, *Affiliated Foods, Inc. v. Strautman*, 656 S.W.2d 753, 763[14] (Mo.App. 1983); *Franklin v. Farmers Mutual Insurance Co.*, 627 S.W.2d 110, 113–14[5] (Mo.App.1982), establishes that in early June, 1983, plaintiffs were interested in purchasing a home for their daughter and son-in-law, Jane and Ken Woods. At that time, the Bank, acting through Stucker, was in the process of foreclosing a deed of trust on the subject tract.

On June 9, 1983, Ken Woods went to the Bank, picked up Stucker, and drove to the tract, situated in "Lynnwood Subdivision on Highway 67 south of Poplar Bluff." Some time after their arrival, they were joined by plaintiffs, Jane Woods, and the Woodses' two children.

Leona Cantrell testified that she asked Stucker where the north boundary lay, and that he said it "runs to the big oak tree which is a hundred and five feet back."

Jane Woods, Ken Woods, and Oscar Cantrell each likewise testified that Stucker identified the big oak tree as the north boundary.

After viewing the property, plaintiffs and the Woodses went to the office of the Bank's attorney, where plaintiffs signed a contract to purchase the tract for $56,000, conditioned upon the Bank being the successful bidder at the foreclosure sale. The Woodses and their children moved into the home, which was vacant, immediately after the contract was signed.

Around June 23, 1983, the Bank purchased the tract at foreclosure. Stucker thereafter phoned Leona Cantrell to arrange the closing. She testified, "I told him I wanted to know where that property line and I meant it." Stucker, according to Mrs. Cantrell, agreed to have a survey made.

Some time in July, 1983, Stucker requested a land surveying and engineering firm "to locate the corners and boundaries of lots 220 through 226" in the Lynnwood Subdivision. Evidently, the tract that plaintiffs had contracted to buy comprised those lots.

On Tuesday, July 26, 1983, Lawrence B. Fisher, a registered land surveyor, assisted by his "crew chief," Jimmy Drew Ice, went to the Lynnwood Subdivision and commenced the survey. They located two concrete monuments embedded in the ground. One marked a corner between "Park Department" land and Lot 220. The other marked a corner between Lot 220 and Lot 221. Ice testified they also found "half inch pipes at the southeast corner of Lot 226 and also at the northeast corner of Lot 226." Utilizing those monuments as reference points for their measurements, Fisher and Ice located the north boundary of the subject tract, marking the line by placing "two half inch rebars" in the ground, with wooden stakes beside the rebars. Fisher and Ice completed their task on the morning of July 27, 1983. The north boundary, as staked by Fisher and Ice, ran beneath the rear deck of the house, as heretofore explained.

1. Stucker sent the deed, accompanied by plaintiffs' check, to the bank on which plaintiffs' check was drawn. When plaintiffs' check was paid by the drawee bank, the deed was turned over to plaintiffs.

Fisher advised Stucker of this by phone "around ten-thirty in the morning," July 27. Stucker went to the site, discussed the situation with Ice, and observed the position of the stakes.

Neither Jane Woods nor Ken Woods was at home either day while the surveyors were there. Jane, employed as a secretary, was at work; Ken, a salesman, was out of town. Plaintiffs, who reside near Cabool, were, of course, not present during the survey.

The sale was closed in Stucker's office at the Bank on the afternoon of July 27, 1983, just hours after Stucker had been to the tract and conversed with Ice. Plaintiffs, Jane Woods, and Stucker attended the closing. Stucker did not mention the result of the survey. Jane Woods testified that Stucker did say, however, that they would get a copy "as soon as it's printed."

On Friday evening, July 29, 1983, Ken Woods returned home and observed the location of the stakes. He phoned Stucker and a "heated conversation" ensued. This suit followed.

There was expert testimony that the value of the tract, assuming the north boundary in fact lies where Fisher and Ice staked it, is $20,000 to $30,000 less than it would have been had the north boundary lay at the oak tree, as represented by Stucker. The Bank raises no issue about the amount of actual or punitive damages awarded.

We first address the Bank's second point, which asserts that the trial court erred in denying the Bank's motion for a directed verdict at the close of all the evidence. The Bank insists that plaintiffs failed to make a submissible case, in that proof of the location of the north boundary was an element of their cause of action and the testimony of Fisher and Ice was "of no probative force because the survey was not shown to have commenced from a corner established by the government."

■ *Carroz v. Kaminiski*, 467 S.W.2d 871, 872 (Mo. banc 1971), is the latest in a line of decisions by the Supreme Court of Missouri wherein it is stated that evidence of a survey which is not definitely shown to have commenced from a corner established by the government or, if lost, reestablished in accordance with statutes,[2] is of no probative force. The rule was first stated in essentially those terms in *T.L. Wright Lumber Co. v. Ripley County*, 270 Mo. 121, 192 S.W. 996, 1000[5] (1917). As authority, *T.L. Wright* relied on *Clark v. McAtee*, 227 Mo. 152, 127 S.W. 37 (1910).

Since *T.L. Wright*, the rule has been repeated by the Supreme Court, in chronological sequence, in *Cordell v. Sanders*, 331 Mo. 84, 52 S.W.2d 834, 838–39[6] (1932); *Klinhart v. Mueller*, 166 S.W.2d 519, 523[1] (Mo.1942); *Bowzer v. State Highway Commission*, 170 S.W.2d 399, 406–07 (Mo.1943); *Landers v. Thompson*, 356 Mo. 1169, 205 S.W.2d 544, 547[7] (1947); *Schell v. City of Jefferson*, 357 Mo. 1020, 212 S.W.2d 430, 433[2] (banc 1948); *Klaar v. Lemperis*, 303 S.W.2d 55, 57[3] (Mo.1957); *Grimes v. Armstrong*, 304 S.W.2d 793, 797 (Mo.1957); and *Carroz*.

Additionally, the rule has been applied by the Court of Appeals in numerous cases, including *Basore v. Johnson*, 689 S.W.2d 103, 106–08 (Mo.App.1985); *Fuller v. Padley*, 628 S.W.2d 719, 721–22 (Mo.App.1982); *Roberts v. Harms*, 627 S.W.2d 924, 926[1–3] (Mo.App.1982)[3]; *Moses v. Dawson*, 596 S.W.2d 741, 743[1] (Mo.App.1980); *Probst v. Probst*, 595 S.W.2d 289, 290–91[2] (Mo.App.1979); *Cornelius v. Tubbesing*, 593 S.W.2d 609, 610[2] (Mo.App.1980); *Moschale v. Mock*, 591 S.W.2d 415, 419–21 (Mo.App.1979); *State ex rel. State Highway Commission v. Dunn*, 569 S.W.2d 353, 356–57 (Mo.App.1978); *Wells v. Elder*, 544 S.W.2d 258, 259[1, 2] (Mo.App.1976); *Burke v. Colley*, 495 S.W.2d 699, 702–03 (Mo.App.1973); and *Pioneer Cooperage*

---

2. Statutes dealing with reestablishment of lost government corners include §§ 60.115–.245, RSMo Cum.Supp.1984, and §§ 446.040–.150, RSMo 1978, as amended.

3. For the latest development in that controversy, see *Roberts v. Harms*, 698 S.W.2d 608 (Mo.App.1985).

*Co. v. Bland,* 228 Mo.App. 994, 75 S.W.2d 431, 435[5] (1934).

One of the elements of plaintiffs' theory of liability, as reflected in the verdict directing instruction tendered by them and given by the trial court, was that Stucker's representation regarding the location of the north boundary was false. It was, consequently, incumbent on plaintiffs to prove where the north boundary actually lay. Plaintiffs do not contend otherwise.

The only evidence regarding the true location of the north boundary was the testimony of Fisher and Ice, and their "field notes." Obviously, whether plaintiffs made a submissible case hinges on whether that evidence had probative value. As already noted, the cases heretofore listed state that such evidence is of no probative force.

Plaintiffs, however, maintain that the evidence did have probative force and was sufficient to make a submissible case. They cite five cases in support of their position. We have carefully studied all five, but, for the reasons that follow, are constrained to reject plaintiffs' contention.

One of the cases cited by plaintiffs, *State v. Turpin,* 196 S.W.2d 798 (Mo.1946), dealt with an objection to the testimony of a professional surveyor on the ground that "the survey hasn't been made from any official plat, and for the further reason that the witness is not the County Surveyor and has not been called in by the parties owning the land for the purpose of making a survey." The objection was based on § 13200, RSMo 1939 (now § 60.150, RSMo 1978 [4]), which read then, as it does now:

"No survey or resurvey, hereafter made by any person, except that of the county surveyor or his deputy, shall be considered legal evidence in any court in this state, except such surveys as are made by the authority of the United States or by mutual consent of the parties."

*Turpin* held that the statute does not make incompetent any evidence which was competent before its enactment; that surveys made in accordance with the statute, if fair on their faces, are prima facie evidence without further proof of their correctness, but that private surveyors may testify from surveys made by themselves and such evidence is competent for what it may be worth. It is manifest that the objection, and the holding, in *Turpin* did not pertain to the rule that a survey which does not commence from a corner established by the government or, if lost, from a corner reestablished in accordance with statutes, is of no probative force. *Turpin,* therefore, does not address the issue raised in the Bank's second point.

*Rhodes v. Tanner,* 591 S.W.2d 90 (Mo. App.1979), also cited by plaintiffs, involved essentially the same question as *Turpin.* It was argued on appeal that a subdivision plat should not have been considered as evidence by the trial court because it was not shown to have been prepared in accordance with § 60.150, RSMo 1969. The opinion held that failure to object when the plat was offered in evidence at trial precluded appellate relief; moreover, the statute does not render inadmissible in evidence surveys made by private persons. *Id.* at 92[3, 4]. It is clear that *Rhodes,* like *Turpin,* did not present the issue confronting us here.

*Turpin v. Watts,* 607 S.W.2d 895 (Mo. App.1980), another case cited by plaintiffs, correctly states that § 60.150, RSMo 1978, does not prohibit the reception of testimony from private surveyors based on surveys they have made. As pertinent here, however, the opinion also states: "We do not wish to be understood as ruling that surveys or 'plats' not commenced at a government corner, or, if that corner is lost, re-established pursuant to statute, will of themselves establish a boundary. The contrary is true." *Id.* at 900[8].

▮ Plaintiffs also refer us to the following language from *Schoen v. Lange,*

---

**4.** *Fuller,* 628 S.W.2d at 721, as we read it, indicates that § 60.150, RSMo 1978, was repealed in 1979. Our research, however, reveals that

§ 60.150 was not repealed then, or at any other time.

238 S.W.2d 902, 904–05 (Mo.App.1951): "[I]f, in making a contract, the parties agree on or assume the existence of a particular fact as the basis of their negotiations, they are estopped to deny the fact so long as the contract stands[.]" From this excerpt, plaintiffs argue that the existence of an admissible survey was a fact assumed by the parties as a basis of their negotiations, therefore the Bank should be estopped from contending that the survey lacks probative force. The frailty in this contention is that no one testified that the furnishing to plaintiffs of a survey that would have probative force in a Missouri court was an element bargained for and agreed upon by the parties during their negotiations. True, plaintiffs insisted that prior to the closing they be furnished a survey showing the location of the north boundary, but it would be torturing the evidence to hold that the parties contemplated that the survey would qualify as competent evidence of the boundary in the event of litigation. Plaintiffs do not contend that any provision in the contract required a survey meeting that standard, and, as the contract has not been furnished us, we have nothing on which to base any such conclusion. Moreover, Ice testified that "the nearest established or re-established government corner" to the tract in issue is "about four or five miles" away. In view of the expense necessarily involved in commencing a survey of the subject tract at a point that far away, we find no merit in plaintiffs' contention that the parties intended that the Bank, at its expense, provide plaintiffs such a survey. We therefore reject plaintiffs' contention that the Bank is estopped to dispute the probative force of the survey.

The final case relied on by plaintiffs, *City of Marshfield v. Haggard*, 304 S.W.2d 672 (Mo.App.1957), is the only one that involved a contention that a survey was without probative force because it was not shown to have started at a government corner. The dispute there was whether improvements on a lot in that City intruded across the north line of a public street. The location of the lot and the street was depicted on an ancient plat. Two surveys, utilizing data appearing on that plat, showed that the north boundary of the street was so positioned that the improvements encroached on the street. Another survey, however, showed that the north boundary of the street lay farther south, and that the improvements did not encroach. The City had the burden of proving encroachment. The landowner contended on appeal that neither of the two surveys adverse to her "started from a government corner." *Id.* at 676. The opinion states that such was unnecessary, in that the parties were in dispute in regard to their relative locations within the same plat, and that their quarrel would be the same no matter where in the section they were located. *Id.* Inasmuch as the City took the street as dedicated and the landowner took title to her lot by deed, both took under the plat and were estopped from questioning the relative locations as they were platted; consequently, they could not dispute the description and location of their property in reference to each other as platted and laid out. *Id.*

We have no trouble in agreeing that where parties take under a plat, they cannot dispute the dimensions of their respective properties as shown on the plat or question the location of their respective properties with regard to each other as shown on the plat. We cannot, however, reconcile *City of Marshfield* with the long line of cases, heretofore listed, which hold that when a party undertakes to establish, in court, the location of a boundary *on the ground*, evidence of a survey which is not definitely shown to have commenced from a corner established by the government or, if lost, reestablished in accordance with statutes, is of no probative force. To the extent that the holding in *City of Marshfield* departs from that rule, we cannot follow such holding, as we are constitutionally bound to follow the last controlling decision of the Supreme Court of Missouri. Mo. Const. art. V, § 2 (1945); *Estate of Seabaugh*, 654 S.W.2d 948, 957[4] (Mo.App. 1983); *State v. Dunn*, 615 S.W.2d 543,

550[15] (Mo.App.1981). As we have seen, the Supreme Court of Missouri, from *T.L. Wright* to *Carroz,* has consistently held that evidence of a survey which is not definitely shown to have commenced from an existent or statutorily reestablished government corner is of no probative force.

Furthermore, we note that the extent to which *City of Marshfield* departs from that rule is debatable, in that the opinion, after abjuring the necessity of the City's surveys starting at a government corner, goes on to express the belief that one of the City's surveys *was* tied to a government corner. *Id.* at 677.

No case has cited *City of Marshfield* as authority for the proposition that in establishing the location of a boundary within a platted subdivision, it is unnecessary for a surveyor to commence from an existent or statutorily reestablished government corner. If that is indeed the import of *City of Marshfield,* such case stands alone, and, in our view, in disharmony with *T.L. Wright* and its progeny.

In the instant case, Fisher and Ice conceded that, in locating and staking the north boundary of the subject tract, they did not commence at an existent or statutorily reestablished government corner. Plaintiffs do not contend otherwise. Moreover, there was no showing that the plat of Lynnwood Subdivision was itself tied to an existent or statutorily reestablished government corner.

■ We therefore hold that the testimony of Fisher and Ice, and their field notes, was without probative force to establish, in court, the location of the north boundary of the subject tract as platted. Inasmuch as proof of the true location of that boundary was an element of plaintiffs' cause of action, plaintiffs failed to make a submissible case.

We recognize that the result of our holding is harsh, particularly in view of the fact that the Bank did not contend at trial that the north boundary lay otherwise than as staked by Fisher and Ice. The Bank, however, was not required to prove where the boundary lay. That duty fell upon plaintiffs.

Whether the "government corner" rule should be inflexibly applied in every case is not for us to say. The rule is so firmly embedded in the case law of Missouri that any departure from it, or any relaxation in its application, is for the Supreme Court of Missouri, not us, to determine.

■ Because there was no competent evidence of the true location of the north boundary, the trial court erred in denying the Bank's motion for a directed verdict at the close of all the evidence. The judgment must therefore be reversed and the cause must be remanded for a new trial. *Klinhart,* 166 S.W.2d at 523; *Basore,* 689 S.W.2d 108–09; *Roberts,* 627 S.W.2d at 927; *Burke,* 495 S.W.2d at 703. In so holding, we have not overlooked the Bank's contention that it is entitled to an outright reversal. The cases just cited, however, persuade us that reversal and remand for a new trial is the proper appellate disposition.

Having come to that conclusion, it is not essential that we address the Bank's first point. However, to ensure that our holding is not thoughtlessly applied outside the narrow limits within which it is confined, we have chosen to do so.

■ The Bank's first point asserts that the trial court erred in *receiving in evidence* the testimony of Fisher and Ice as to the location of the north boundary, in that they did not begin their survey at an existent or statutorily reestablished government corner. We point out that while such testimony was without probative force to establish the true location of the north boundary, it nonetheless demonstrated that Stucker, at the time of the closing, was aware that, according to the survey, the north boundary did not lie where he had said it did when he showed the property to plaintiffs and the Woodses on June 9, 1983. If the only purpose of the testimony of Fisher and Ice had been to prove the location of the north boundary, we would agree with the Bank that the trial court should have excluded such testimony. However,

because such testimony showed that Stucker, at the time of the closing, knew the surveyors had staked the boundary at a location other than where he had earlier told plaintiffs it lay, we are satisfied that such testimony was admissible on the issue whether Stucker concealed a fact—the result of the survey—which he should have revealed.

The Bank's final assignment of error assails the verdict directing instruction, M.A.I. 23.05 [1981 Revision], as modified.

Plaintiffs' theory, as we discern it from that instruction, was not that Stucker willfully misrepresented the location of the north boundary when plaintiffs and the Woodses initially viewed the tract on June 9, 1983. Instead, plaintiffs submitted their claim on the theory that Stucker, *at the time of the closing*, knew, by reason of the survey, that his representation of June 9, 1983, had been incorrect. Plaintiffs hypothesized that Stucker consequently had a duty to advise plaintiffs thereof prior to the closing, but that Stucker failed to do so, knowing all the while that plaintiffs were continuing to rely on his representation of June 9, 1983. The verdict directing instruction tendered by plaintiffs endeavored to submit that theory. The Bank does not question the soundness of plaintiffs' theory, but only the manner in which the verdict directing instruction submitted it.

We need not, on this appeal, decide whether the instruction is vulnerable to any of the attacks upon it by the Bank.[5] On retrial, plaintiffs will have had ample opportunity to assess the Bank's contentions, and to consider whether, in view of those contentions, they desire to again submit their claim by the same instruction.

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

PREWITT, C.J., and FLANIGAN and MAUS, JJ., concur.

---

**5.** Our eschewal of the instructional issue does not offend *Grippe v. Momtazee,* 696 S.W.2d 797, 798–99[3] (Mo. banc 1985). There, the *defendants* won a jury verdict in the trial court, and the *plaintiff* appealed, assigning four trial errors. *Grippe* held that the assignments of error should be addressed, and only after a favorable finding for the plaintiff on one or more of the assignments of error could the appellate court reach the issue whether the plaintiff had made a submissible case—a question inherent in deciding whether the error found by the appellate court merited reversal or remand for a new trial. In the instant case, plaintiffs won in the trial court, and it is the Bank—the aggrieved party—that assigns error in plaintiffs' failure to make a submissible case. That assignment of error, being meritorious, is dispositive of this appeal.