MASSACHUSETTS GENERAL LIFE
INSURANCE COMPANY,
Plaintiff–Respondent,

v.

Ray Eugene SELLERS, Adele J.
Sellers and Mistwood, Inc.,
Defendants–Appellants.

No. 17813.

Missouri Court of Appeals,
Southern District,
Division Two.

June 25, 1992.

Michael L. McDorman, McDorman & Hayden, Versailles, for defendants-appellants.

Nicholas M. Monaco, Kevin R. Jones, Inglish & Monaco, P.C., Jefferson City, for plaintiff-respondent.

SHRUM, Presiding Judge.

In this quiet title suit involving Camden County real estate, the defendants, Ray Eugene Sellers, Adele J. Sellers, and Mistwood, Inc., appeal from a judgment which quieted title to the disputed real estate in the plaintiff, Massachusetts General Life Insurance Company. The plaintiff's action was based on § 527.150, RSMo 1986.[1] By their counterclaim the defendants sought title by adverse possession under § 516.-010, RSMo 1986 (the ten-year statute), and they sought possession on an ejectment theory.

The defendants do not challenge the denial of their counterclaims. Instead they complain that (a) evidence of a survey relied upon by the plaintiff should not have been admitted because of alleged failure to start the survey from a government corner; (b) the plaintiff did not make a "prima facie case" that the land described in its petition by metes and bounds was the same land described in its deed; (c) the plaintiff's action is a boundary dispute so that the proper remedy is ejectment and not quiet title; and (d) the judgment "constituted equitable relief and is outside the scope of plaintiff's pleadings." Finding no merit to these arguments, we affirm.

## FACTS

On March 27, 1973, the defendant Mistwood, Inc., conveyed certain Camden County real estate to Jagar Financial Corporation. The warranty deed, signed by Eugene Sellers, president of Mistwood, Inc., described several tracts. Among them were two tracts: the N½ of Lot 1 of the NW¼ of Section 18, Township 39, Range 17, and part of the NW¼ of the NE¼ of Section 18, Township 39, Range 17. The latter tract was described by metes and bounds. The metes and bounds description began at the northwest corner of the NW¼ of the NE¼ of Section 18 and ran easterly along the north line of that quarter-quarter to a point on "the centerline of a 40 foot road, said point being 1495.3 feet West of the Northeast corner of Section 18." At that point, the metes and bounds description continued along the center-line of the 40–foot road as it meandered southwesterly across the quarter-quarter. The description eventually left the road and ran westerly to a point where it intersected the west line of the west half of the northeast quarter and then ran north along that west line to the place of beginning.[2]

1. § 527.150.1, RSMo 1986, provides, in part, "Any person claiming any ... interest in real property, whether ... legal or equitable ... whether in possession or not, may institute an action against any person ... having or claiming to have any title ... whether in possession or not, to ascertain and determine the estate, title and interest of said parties, respectively, in such real estate...."

2. Attached to this opinion is a reproduction of a surveyor's plat received in evidence as the plaintiff's exhibit 7. On that plat there appears a 40–foot roadway, marked Road "A". The courses and distances shown in parentheses along Road "A" are those that appear in the March 27, 1973, deed from Mistwood to Jagar. Other courses, distances, and calls on the plat are the result of

On the same day it received the warranty deed, March 27, 1973, Jagar gave Bankers Union Life Insurance Company a deed of trust which secured a $300,000 note. The deed of trust described the following:

> All of the North one half (N½) of Lot One (1) of the Northwest Quarter (NW¼) and that part of the Northwest Quarter of the Northeast Quarter (NW¼ NE¼) of Section 18 *Township 37 North,* Range 17 West, Camden County, Missouri, *lying North and West of the existing road.* (Emphasis added).

On April 10, 1979, pursuant to a judgment of the Camden County Circuit Court in a case styled "Bankers Union Life Ins. Co. vs. Jagar Financial Corp., Case No. 7329, the legal description in the Bankers Union deed of trust was reformed to read "Township 39 North," instead of "Township 37 North." The trial court in the instant case took judicial notice of Case No. 7329. Later, on March 6, 1985, a foreclosure of the Jagar deed of trust occurred with Bankers Union being the high bidder. The deed of trust description, as reformed, was used in the trustee's deed. It is that deed upon which the plaintiff[3] rests its claim of ownership to all of the land north and west of Road "A". The plaintiff claims that the "existing road" mentioned in the deed of trust and in the trustee's deed is the same road as Road "A" on exhibit 7.

On October 22, 1985, the defendant Mistwood, as grantor, signed and delivered a deed to the defendants Ray Eugene Sellers and Adele J. Sellers purporting to convey to them part of the land claimed by the plaintiff. Specifically included within the metes and bounds description of that deed

is the disputed land—that which lies between Road "A" and Lake Road 5–58, depicted in the appendix by cross-hatching.

This suit followed.[4] As the trial court noted in its judgment "the crux of the dispute is [the] identity of the 'existing road'" as that term is used in the Jagar to Bankers Union deed of trust and as used in the trustee's deed to Bankers Union. The plaintiff's suit is based upon the assertion that the "existing road" referred to in Jagar's deed of trust and in the trustee's deed is Road "A". The plaintiff seeks title to all of the land in question which lies north and west of Road "A". The defendants claim that the road referred to in the plaintiff's description is Lake Road 5–58 and that they own all land shown on the plat lying north and east of Lake Road 5–58.

The trial court found the issues for the plaintiff and the defendants appeal. We will set out additional facts where relevant to the defendants' points on appeal.

## SURVEY FROM GOVERNMENT CORNER

■ In Point I the defendants argue that the trial court erred by allowing surveyor Harms to testify, over objection, that his survey was tied to a government corner[5] and erred in admitting a plat of that survey without requiring production and admission of field notes and other records supporting his claim that he had commenced the survey at a government corner. They cite *Burke v. Colley,* 495 S.W.2d 699, 702 (Mo. App.1973), where the court said:

> NW NE, Sec. 18, Twp. 39, Rng. 17." Pursuant to a May 15, 1984, Camden County Circuit Court judgment, that collector's deed was set aside in a case styled "Bankers Union Life Ins. Co. vs. Hanks and Mistwood, Inc., Case No. CV180–171CC."

---

a survey performed in 1987 by a survey crew supervised by licensed surveyor Gerard J. Harms who testified for the plaintiff. The disputed land is indicated by cross-hatching.

**3.** The plaintiff, Massachusetts General Life Insurance Company, merged with Bankers Union. The plaintiff was the surviving corporation.

**4.** There was earlier litigation between the plaintiff and the defendant Mistwood. A collector's deed issued by the Camden County Collector, dated August 22, 1977, purported to convey to Mistwood the following: "N ½ Lot 1 NW, Pt.

**5.** "'Original corners as established by the government surveyors, if they can be found, or the places where they were originally established, if they can be definitely determined, are conclusive, without regard to whether they were located correctly or not.'" *Woods v. Johnson,* 264 Mo. 289, 174 S.W. 375, 376 (1915).

"A surveyor's testimony is never receivable except in connection with the data from which he surveys, and, if he runs lines, they are of no value, unless the data is established from which they are run and must be distinctly proven, or there is nothing to enable any one to judge what is the proper result."

They also rely upon *Cornelius v. Tubbesing*, 593 S.W.2d 609 (Mo.App.1980), where it is said that " '[e]ven the testimony of a surveyor as to the location of boundary lines is not to be received unless the data from which such lines are run is produced and proved.' " *Id.* at 610. Those cases correctly state the law but the facts considered in each of them differ from those in the instant case in an important particular. In *Burke* and *Cornelius* there was no evidence that the surveys were tied to a government corner, whereas here such evidence is found in the testimony of surveyor Harms.

In *Burke* a survey of the disputed land was performed by the Ripley County Surveyor, Vincent, in 1967. Later, plaintiff hired the then County Surveyor, Hardy Martin, and W.H. Ice, a registered land surveyor, to prepare what was variously described as a "survey, map and plat" which was received in evidence, over objection, as exhibit 3. Martin and Ice did not actually survey the property, but visited it. In preparing exhibit 3, Martin and Ice were furnished the Vincent survey and field notes (which were in evidence) as well as government notes, a copy of the official government plat, and aerial photographs (none of the latter being in evidence). Upon appeal the *Burke* court held that the Vincent survey was incompetent and should not have been received in evidence because it failed to show that it commenced at a government corner or a statutorily re-established corner. The court continued:

The exhibit prepared by Ice and his testimony relative thereto are of no probative force to delineate the boundaries of the properties involved. The exhibit was not tied to a government marker or legally re-established corner. It had as its underlying basis the Vincent survey and we have held the latter fails to meet

the requisite legal standard. In addition, the Ice exhibit was based on assumption and conclusions from documents which were not offered in evidence. "Even the testimony of a surveyor as to the location of boundary lines is not to be received unless the data from which such lines are run is produced and proved." Finally, no survey was in fact made by Hardy and Ice.

495 S.W.2d at 702–03 (citations omitted).

A similar situation existed in *Cornelius* in which Judge Billings observed:

Plaintiffs' case was bottomed upon the private survey and a representative of the survey firm testified that this survey had been prepared from earlier surveys made for Coan and a legal description furnished by plaintiffs' attorney. There was no evidence that the prior surveys or the later survey were tied to a government corner.

593 S.W.2d at 610.

In this case, in contrast, the evidence that Harms tied his survey to a government corner is found in his testimony.

Q. (To Harms) Did you begin the survey at a government corner?

A. Yes, we did.

Q. What government marker did you begin at?

A. ... [B]egan at the northeast corner of Section 18, [Township] 39, [Range] 17.

Q. And what government marker, if any, did you find there?

A. It was an old axle in that corner that had been referenced.

. . . .

Q. Is there any doubt in your mind that the government corner was found by your people and that the survey began at the government corner?

A. No. The corner had been perpetuated for years and we had no reason to dispute it.

Additional testimony from Harms explained how he determined the axle to be a perpetuation of the original government corner.

Q. (To Harms) But do you have notes from Camden County to indicate that's how the government corner is marked by an axle?

A. The old deeds and our research from the GLO records in Rolla from the state land survey office had indicated that that corner had been set with an axle.

. . . .

Q. Well, are you telling me that you then relied upon the notes from Rolla as to the government corners to locate or did you rely on the survey ... [f]rom Land Surveyor 1223?

A. When we do research and we receive all of the information in a section from the government land office and from the land surveyor's office in Rolla, we get all of the previous government surveys. We get all of the plats that have been filed, done by private or county surveyors in that section. We get all of the remonumentation forms. We get all of the information that has been on file or that is on file at the government land or the land surveyor's office in Rolla.

We put that all together. We plot it out to see what we have got and what has been established and recognized as a section corner or quarter corner or whatever the case may be, and *if there is a history on that corner, and it's been—*

*it's been remonumented and recertified over the years, we use it. It's an established corner.*

If Land Surveyor 1223 has a survey that's been filed with Rolla and it's a good survey, they have accepted it ... we use it.... [W.]e are not going to go back and resurvey a township to verify a section corner that's been used for 50 years.

Q. Used by other surveyors?

A. Other surveyors and accepted by property owners. (Emphasis added.)

By such testimony Harms laid a sufficient basis for the admission of his opinion that he had tied his survey to a government corner. Although he did not describe the existence of sufficient original evidence on the ground to definitely locate the original corner, he did describe the existence of records of other surveyors as well as the original field notes, all of which he had examined and which were, in his opinion, adequate to perpetuate the original corner.[6]

■ Much of a surveyor's testimony is actually in the nature of expert testimony, and to some extent his conclusions are permissible, when supported by facts. *Grimes v. Armstrong*, 304 S.W.2d 793, 797[2] (Mo.1957). Such principle takes on additional meaning by reason of the new and liberalized rule governing the admission of expert opinion, § 490.065, RSMo Supp.1989. Under § 490.065.3[7] Harms

6. The necessity for recognizing perpetuated corners as evidence of the original government corners arises from the fact that the United States Public Land Survey System was established in the early 1800's with crude surveying equipment. 10 CSR 30–3.010 (5/13/82). Original monumentation frequently consisted of placing wooden stakes at the section and half section corners and recording the location of the corner by referencing it to accessories, often nearby trees. 10 CSR 30–3.010(3)(H) (5/13/82) defines a "monument" as "the physical object which marks the corner point determined by the surveying process. The accessories, such as bearing trees, bearing objects, reference monuments, mounds of stone and other similar objects that aid in identifying the corner position, are also considered a part of a corner monument." Although recording the size, kind, and location of such witness trees was the accepted practice for marking the original government corners, the passage of time and people obviously soon destroyed the wooden stakes and by

now, almost all original witness trees. Yet, a corner remains as an "existent corner" if it can be located by an "acceptable supplemental survey record or some physical evidence thereof or by testimony." 10 C.S.R. 30–3.010(3)(F). If earlier records exist in which county or other surveyors positively showed that subsequent witness marks were placed and/or perpetuated when there was still positive evidence of the identifying witness marks placed by the original government surveyors, and if the chain of perpetuation has not been broken and evidence of the perpetuation exists, such "perpetuated corners" are acceptable evidence of the original corners. Missouri Land Survey Pamphlet, Missouri Department of Natural Resources, Division of Geology and Land Survey.

7. § 490.065.3 reads: "The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing

could rely on records of the DNR's Division of Geology and Land Survey in expressing his opinion that he had started at a perpetuated corner because (a) he was aware of the records before the hearing; (b) the records are of a type reasonably relied upon by surveyors in forming their opinions or inferences; and (c) the records are otherwise reasonably reliable. The plaintiff's evidence that Harms's survey started at a government corner was not conclusive. It could have been overthrown by other evidence. The defendants could have produced Land Survey records which might have convinced the trial court or this court that Harms's opinions were wrong. This they did not do. Here, there is substantial evidence, which the trial court apparently believed, that Harms's survey started from a government corner. No error exists in the admission of Harms's testimony or his survey. Point I is denied.[8]

### ALLEGED FAILURE OF PROOF

In one prong of Point II the defendants say that the trial court erred in quieting title in plaintiff because the "plaintiff failed to prove prima facie the lands described by metes and bounds in its petition were one and the same as the lands described in the trustee's deed." They argue that (a) although the plaintiff received a deed that mentions Section 18, Township 39, Range 17, that fact does not give rise to a presumption that the plaintiff did in fact own land within that section, township, and range; (b) there is no requirement that there must in fact be land which lies north and west of an existing road (assuming that the road is Lake Road 5–58 as the defendants contend) simply because plaintiff has a deed which appears to give it some land in that particular section, township, and range; and (c) even if it was presumed that the plaintiff is entitled to have some land in this section, the record is devoid of evidence to support the trial court's choice of Road "A" as the eastern boundary of the plaintiff's land.

We disagree. The defendants' argument ignores certain facts and overlooks certain principles of law.

The trial court issued detailed findings of fact and conclusions of law, including the following which are supported by the record. We paraphrase: (a) the N½ of Lot 1 of the NW¼ of Section 18, Township 39, Range 17 was described in (i) the deed from Mistwood to Jagar, (ii) the trust deed (as reformed) from Jagar to the plaintiff's predecessor (Bankers), and (iii) the trustee's deed to the plaintiff; (b) the easternmost road on exhibit 7, marked as Road "A", is the eastern boundary of that part of the NW¼ of the NE¼ of Section 18 conveyed by Mistwood to Jagar on March 27, 1973; (c) even though there are two other roads in the disputed land, neither party contends that either of those roads is the existing road referred to in the deed of trust and in the trustee's deed; and (d) the defendants' claim that Lake Road 5–58 is the "existing road" referred to in the deed of trust and in the plaintiff's deed would render the rest of the description, i.e., "lying north and west of the existing road," meaningless, and such claim, under the facts of this case, would be impossible.

■ It is a well established principle in Missouri that an ambiguity in a description will be settled if the grantor owns the land by one description and not by another. 1 Gill on Missouri Titles § 133, p. 126, (4th ed. 1960). Under this view if a grantor

---

and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable."

8. We observe that in 1991 the General Assembly removed, at least until August 28, 1996, the long-standing requirement that to be admissible, a survey had to start at a government corner. Section 60.150, RSMo Supp.1991, provides:

 1. No survey or resurvey made hereafter shall be admitted into evidence in any court in this state unless it is made by a registered land surveyor, and it can be shown that the survey is located by measurements to monuments of the section, United States survey, subdivision, or other unit in which the property is legally described. A survey may not be rejected, after August 28, 1991, solely on the grounds that it did not commence at a government corner.

 2. The provisions of this section shall expire on August 28, 1996.

owns any real estate which corresponds in part to the description in the conveyance, the court may reject an interpretation that will convey nothing in favor of an interpretation that conveys something. *McMahan v. Hubbard,* 217 Mo. 624, 118 S.W. 481, 485 (1909). As this court has said:

> [P]eople are presumed not to intend nullities by their solemn conveyances and if one construction will render a deed operative and a competing construction will render it wholly inoperative, the former is preferred if not unreasonable nor legally impossible. *Hobbs v. Yeager,* 263 S.W. 225 (Mo.1924). Validity is favored over invalidity. *Beauchamp v. Beauchamp,* 381 S.W.2d 804 (Mo.1964).

*Jones v. Cox,* 629 S.W.2d 511, 513 (Mo.App. 1981).

■ When Jagar included in its deed of trust a description for land in the NW¼ of the NE¼ of Section 18 the conveyance would be operative to convey land in that quarter-quarter section if Road "A" was the "existing road" referred to. It would be inoperative to convey land in that quarter-quarter if, as the defendants contend, Lake Road 5–58 was the "existing road" described because of the northwest to southeast course of Lake Road 5–58. Any ambiguity in the plaintiff's description was correctly settled by the trial court's recognition that Jagar owned land which would be conveyed if the Road "A" description was intended to be the eastern boundary of the land conveyed, whereas use of Lake Road 5–58 as a boundary would render the Jagar to Bankers Union description inoperative to convey anything in the NW¼ of the NE¼ of Section 18. The physical location and course of the respective roads provide sufficient evidence to support the trial court's judgment. The defendants' argument to the contrary is without merit.

The defendants make an additional argument in Point II—without setting it forth in their point relied on—that collateral estoppel precludes the plaintiff from seeking to "again reform the legal description." They argue that because Bankers (the plaintiff's predecessor) had filed a suit against Jagar to reform the deed of trust to correct the township but did not then seek to reform the legal description so as to refer to Road "A" as a boundary, the plaintiff cannot do so in this action.

■ Initially, we observe that the defendants cannot allege a point relied on based on one theory and argue another theory in the argument portion of their brief.

> "The reviewing court is obliged on an appeal to determine only those questions stated in the 'Points Relied On,' and matters which defendant but casually alludes to in the argument portion of its brief without having stated them under 'Points Relied On' are not preserved for appellate review."

*Landoll by Landoll v. Dovell,* 779 S.W.2d 621, 627 (Mo.App.1989). The collateral estoppel argument was not preserved for appellate review.

■ We also observe that the collateral estoppel argument is without merit. That doctrine may apply if (1) the issue decided in the prior case was identical; (2) the prior adjudication resulted in a judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party or in privity with a party in the prior adjudication; and (4) the party sought to be estopped had a full and clear opportunity to litigate the issue in the prior suit. *Oates v. Safeco Ins. Co. of America,* 583 S.W.2d 713, 719 (Mo.banc 1979); *Patterson v. Null,* 751 S.W.2d 381, 386 (Mo.App.1988). "Collateral estoppel does not reach issues which might have been litigated; only those which were necessarily and unambiguously decided." *Patterson,* 751 S.W.2d at 386.

■ The only issue necessarily and unambiguously decided in the Jagar reformation case was whether the land was in Township 39 or 37. The amount of land owned by the plaintiff and its boundaries and location were not decided. Whether the deed of trust description, once reformed, included what the plaintiff contends for or what the defendants contend for in this suit was not decided. Collateral estoppel principles do not apply in this case. This portion of Point II is rejected.

## PROPER REMEDY—QUIET TITLE OR EJECTMENT

In another prong of Point II the defendants assert that the trial court erred in quieting title in the plaintiff because the "plaintiff's action is a boundary dispute and the proper remedy is ejectment and not a quiet title action." To support their argument they cite *Moss v. Moss*, 706 S.W.2d 884 (Mo.App.1986), in which the following situation existed:

[I]t appears beyond question that neither Alice nor Willie and Belle [the litigants] are claiming title to any land of which the other has title, nor is there any assertion of a claim to title by virtue of possession.... The disagreement is not one of competing claims to the same land but an inability to settle the location on the ground of the north boundary line between the tract conveyed and that retained by Willie and Belle.

*Id.* at 887.

Under those facts, the *Moss* court held that the appropriate remedy was ejectment, not quiet title, and that the trial court erred in decreeing fee simple ownership when the actual claim was one to settle a disputed boundary. *Id.* at 888.

The defendants' reliance on *Moss* is misplaced because this record shows a different situation. Here, neither party admitted the title of the other. Rather, the pleadings and the evidence demonstrate a lack of mutual acknowledgement by the parties of the title source and legal description of the other's ownership. The plaintiff alleged that by the description in the trustee's deed it owned all of the N½ of Lot 1 of the NW¼ of Section 18 and all of the NW¼ of the NE¼ of Section 18 lying north and west of Road "A". The defendants denied that allegation and stated affirmatively that "Mistwood, Inc. claims fee simple absolute ownership of that portion of the real estate described in paragraph 4 Plaintiffs First Amended Petition [that description taken from exhibit 7] laying [sic] North and East of Lake Road 5–58." Clearly, a title controversy existed, and the quiet title action was appropriate. *Lollar v. Maness*, 765 S.W.2d 695, 698 (Mo.App.1989).

## RELIEF OUTSIDE THE SCOPE OF THE PLEADINGS

In their final point the defendants argue that the trial court erred because the "judgment constituted equitable relief and is outside the scope of plaintiff's pleadings." We find no merit in this point. Nothing in the argument portion of the defendants' brief and nothing in the record support the contention that the "judgment constituted equitable relief."

In their brief the defendants recognize that the plaintiff bases its action on § 527.150, RSMo 1986. In discussing § 527.150 one commentator has said "[i]t is difficult to imagine a quiet title law being broader or more inclusive than the Missouri statute." I Mo. Real Estate Practice § 4.14 (MoBar 3rd ed. 1986, 1988). A quiet title suit under this section is a special statutory action to adjudge the respective title, estate and interests of claimants to land and is an action at law or in equity according to the issues presented by the pleadings. *Lloyd v. Garren*, 366 S.W.2d 341, 344 (Mo.1963). Section 527.150 expressly authorizes quiet title relief under both legal and equitable principles. The only restriction is that equitable relief cannot be granted in a general quiet title suit, and it must be prayed for in the petition. *See, e.g., Rains v. Moulder*, 338 Mo. 275, 90 S.W.2d 81 (1936); *Stafford v. Shinabargar*, 336 Mo. 856, 81 S.W.2d 626 (1935).

Whether a cause of action under this section is at law or sounds in equity depends upon the fact stated and the character of the relief sought. *Baker v. Lamar*, 140 S.W.2d 31, 34 (Mo.1940). To illustrate, in *Stafford*, plaintiff sought to quiet title in her by asking the court to cancel a note and deed of trust; such action was said to be in equity and not at law. *Id.* 81 S.W.2d at 627. In *Rains*, plaintiff's quiet title petition was in conventional form but defendants, by their answer, sought removal of allegedly void deeds—a matter of equitable cognizance. *Id.* 90 S.W.2d at 84. In *Lloyd*, injunctive relief was sought as part of the quiet title suit; hence, the action was treated as one in equity. *Id.* at

344. In contrast, in *Baker* a § 527.150 quiet title suit was held to be an action at law where no facts were stated which would make the cause one in equity and no affirmative equitable relief was sought. *Id.* at 34.

 Here, the plaintiff's petition was in conventional form[9] and the only relief sought was a quiet title decree. No injunctive relief was sought by the plaintiff and none was granted by the trial court. The decree granting the plaintiff's request reads, in pertinent part: "IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that title to the following described land is quieted in Plaintiff in fee simple absolute: [the exhibit 7 metes and bounds description followed]." By its judgment the trial court gave no affirmative equitable relief and did not set aside any deed or other instrument; the relief granted was a determination of the existing title as between the litigants. As no equitable relief was granted, the defendants' point is without merit.

We affirm the judgment for the plaintiff.

FLANIGAN, C.J., and MONTGOMERY, J., concur.

---

**9.** The plaintiff's petition and count I of the defendants' counterclaim were patterned after and closely tracked the quiet title petition form in 10 Missouri Practice, Rule 93.01, p. 465, Wheaton–Blackmar (1962).